820 A.2d 27 (2003)
359 N.J. Super. 291
Mayor Sharpe JAMES and The City of Newark, New Jersey, Plaintiffs-Respondents,
v.
ARMS TECHNOLOGY, INCORPORATED; B.L. Jennings, Inc.; Beretta U.S.A.; Browning Arms Co.; Bryco Arms; Colt's Manufacturing Co.; Glock, Inc.; H & R; Heckler & Koch, Inc.; International Armament Corp. (d/b/a "Interarms Industries, Inc."); MKS Supply, Inc. (d/b/a "Hi-Point Firearms"); Phoenix Arms; Sigarms, Inc.; Smith & Wesson Corp.; Sturm, Ruger & Company, Inc.; Taurus International Manufacturing, Defendants-Appellants, and
Arcadia Machine & Tool; Carl Walther; Charter Arms, Inc.; Davis Industries; Forjas Taurus, S.A.; Full Metal Jacket, Inc.; Glock GMBH; Heckler & Koch, GMBH; Lorcin Engineering Co., Inc.; Navegar, Inc. (d/b/a "Intratec"); Fabbrica D'Armi Pietro Beretta S.P.A.; Sundance Industries; National Shooting Sports Foundation, Inc.; Sporting Arms and Ammunition Manufacturers Institute, Inc.; Navy Arms Company, Inc.; Ray's Sporting Goods, Defendants.
Mayor Sharpe James and The City of Newark, Plaintiffs-Respondents,
v.
Ray's Sporting Goods, Defendant-Appellant, and
Arcadia Machine & Tool; Arms Technology, Incorporated; B.L. Jennings, Inc.; Beretta U.S.A.; Browning Arms Co.; Bryco Arms; Carl Walther; Charter Arms, Inc.; Colt's Manufacturing Co.; Davis Industries; Forjas Taurus, S.A.; Full Metal Jacket, Inc.; Glock, Inc.; Glock GMBH; H & R; Heckler & Koch, Inc.; Heckler & Koch, GMBH; International Armament Corp. (d/b/a "Interarms Industries, Inc."); Lorcin Engineering Co., Inc.; MKS Supply, Inc. (d/b/a "Hi-Point Firearms"); Navegar, Inc. (d/b/a "Intratec"); Phoenix Arms; Fabbrica D'Armi Pietro Beretta S.P.A.; Sigarms, Inc.; Smith & Wesson Corp.; Sturm, Ruger & Company, Inc.; Sundance Industries, Inc.; Taurus International Manufacturing, Inc.; National Shooting Sports Foundation, Inc.; Sporting Arms and Ammunition Manufacturers Institute, Inc.; Navy Arms Company, Defendants.
Mayor Sharpe James and The City of Newark, Plaintiffs-Respondents,
v.
Navy Arms Company, Inc., Defendant-Appellant, and
Arcadia Machine & Tool; Arms Technology, Incorporated; B.L. Jennings, Inc.; Beretta U.S.A.; Browning Arms Co.; Bryco Arms; Carl Walther; Charter Arms, Inc.; Colt's Manufacturing Co.; Davis Industries; Forjas Taurus, S.A.; Full Metal Jacket, Inc.; Glock, Inc.; Glock GMBH; H & R; Heckler & Koch, Inc.; Heckler & Koch, GMBH; International Armament Corp. (d/b/a "Interarms Industries, Inc."); Lorcin Engineering Co., Inc.; MKS Supply, Inc. (d/b/a "Hi-Point Firearms"); Navegar, Inc. (d/b/a "Intratec"); Phoenix Arms; Fabbrica D'Armi Pietro Beretta S.P.A.; Sigarms, Inc.; Smith & Wesson Corp.; Sturm Ruger & Company, Inc.; Sundance *28 Industries, Inc.; Taurus International Manufacturing, Inc.; National Shooting Sports Foundation, Inc.; Sporting Arms and Ammunition Manufacturers Institute, Inc.; Ray's Sporting Goods, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued December 9, 2002.
Decided March 11, 2003.
*32 Lawrence S. Greenwald, of the Maryland bar, Baltimore, admitted pro hac vice, argued the cause for appellant Beretta U.S.A. (Gordon, Feinblatt, Rothman, Hoffberger & Hollander, and Schnader, Harrison, Segal & Lewis, attorneys); Mr. Greenwald, Catherine A. Bledsoe, Louis R. Moffa, and Harris Neal Feldman, on the brief of all appellants in A-3098-01T3.
Renzulli, Pisciotti & Renzulli, attorneys for appellants Arms Technology, Inc., Browning Arms Co., Glock, Inc., H & R, and MKS Supply, Inc. (d/b/a "Hi-Point Firearms").
Kelly, McLaughlin & Foster, Collingsworth, attorneys for appellants B.L. Jennings, Inc., and Bryco Arms.
Riker, Danzig, Scher, Hyland & Peretti, attorneys for appellant Colt's Manufacturing Co., Inc.
Holland & Knight, attorneys for appellant Heckler & Koch, Inc.
Timothy G. Atwood, Shelton, CT, attorney for appellant International Armament Corp. d/b/a "Interarms Industries, Inc."
Marshall Dennehy Warner Coleman & Groggin, attorneys for appellant Phoenix Arms.
Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, attorneys for appellant Sigarms, Inc.
Dughi, Hewit & Palatucci, attorneys for appellant Smith & Wesson Corp.
James P. Dorr, of the Illinois bar, Chicago, admitted pro hac vice, argued the cause for appellant Sturm, Ruger & Company, Inc. (Carpenter, Bennett, & Morrissey, attorneys).
Budd Larner Gross Rosenbaum Greenberg & Sade, attorneys for appellant Taurus International Manufacturing.
Mark C. Saperstein, Keith T. Vernon, of the Louisiana bar, admitted pro hac vice, (Castano Safe Gun Litigation) and Terry P. Bottinelli, Hackensack, argued the cause for respondents (Davis, Saperstein & Salomon; Joanne Y. Watson and Joseph Gillespie, Newark Corporation Counsel; Climaco, Lefkowitz, Peca, Wilcox & Garofoli; Brown & Brown; Keith T. Vernon (Castano Safe Gun Litigation), Herten, Burstein, Sheridan; and Daniel G. Abel, of the Louisiana bar, admitted pro hac vice, (Gauthier, Downing, LaBarre) Keven C. Decie, on the brief in A-3101-01T3, also *33 serving as respondents' brief in A-3098-01T3).
McCarter & English, attorneys for amicus curiae National Association of Manufacturers (William J. O'Shaughnessy, of counsel, and John E. Flaherty, on the brief for A-3098-01T3).
Pepper Hamilton, attorneys for amicus curiae Product Liability Advisory Council, Inc. (James M. Beck, of the Pennsylvania bar, admitted pro hac vice, and Michael O. Petrone, both of counsel and on the brief for A-3098-01T3, A-3101-T3, and A-3103-01T3).
Brian J. Siebel, Washington, DC, argued the cause for amicus curiae City of Camden, City of Jersey City, Ceasefire New Jersey, Million Mom March State of New Jersey, Brady Center to Prevent Gun Violence, and Brady Campaign to Prevent Gun Violence United with the Million Mom March (Trujillo Rodriguez & Richards; Terry Lavy, City Attorney, City of Camden; Alexander W. Booth, Jr., Corporation Counsel, Jersey City Law Department; and Brady Center to Prevent Gun Violence Legal Action Project, attorneys); (Lisa J. Rodriguez, on the brief for A-3098-01T3, A-3103-01T3, and A-3103-01T3).
Gloria B. Cherry, argued the cause for appellant Ray's Sporting Goods (Braff, Harris & Sukoneck, attorneys; Ms. Cherry, on the brief).
Mark C. Saperstein, Keith T. Vernon, of the Louisiana bar, admitted pro hac vice, (Castano Safe Gun Litigation) and Terry P. Bottinelli, Hackensack, argued the cause for respondents (Davis, Saperstein & Salomon; Joanne Y. Watson and Joseph Gillespie, Newark Corporation Counsel; Climaco, Lefkowitz, Peca, Wilcox & Garofoli; Brown & Brown; Keith T. Vernon (Castano Safe Gun Litigation), Herten, Burstein, Sheridan; and Daniel G. Abel, of the Louisiana bar, admitted pro hac vice, (Gauthier, Downing, LaBarre) Keven C. Decie, on the brief in A-3101-01T3, also serving as respondents' brief in A-3098-01T3).
Post, Polak, Goodsell, MacNeill & Strauchler, Roseland, attorneys for appellant Navy Arms Company, Inc., joins in the appellants' briefs in A-3098-01T3, A-3101-01T3, and A-3103-01T3.
Mark C. Saperstein, Keith T. Vernon, of the Louisiana bar, admitted pro hac vice, (Castano Safe Gun Litigation) and Terry P. Bottinelli, Hackensack, argued the cause for respondents (Davis, Saperstein & Salomon); Joanne Y. Watson and Joseph Gillespie, Newark Corporation Counsel; Climaco, Lefkowitz, Peca, Wilcox & Garofoli; Brown & Brown; Keith T. Vernon (Castano Safe Gun Litigation), Herten, Burstein, Sheridan; and Daniel G. Abel, of the Louisiana bar, admitted pro hac vice, (Gauthier, Downing, LaBarre) (Keven C. Decie, on the brief in A-3101-01T3, also serving as respondents' brief in A-3098-01T3).
Before Judges HAVEY, A.A. RODRÍGUEZ and PAYNE. *29 *30
*31 The opinion of the court was delivered by HAVEY, P.J.A.D.
Since 1995, over thirty cities and counties have filed law suits in other jurisdictions against gun manufacturers seeking to recover the cost of governmental services associated with gun violence.[1] Many of the cases have been dismissed on the *34 pleadings on the bases, among others, that: (1) the public entity lacked standing; (2) its alleged damages were too remote to satisfy the proximate cause element; and (3) the gun manufacturers' conduct did not constitute a public nuisance.[2] In others, courts have addressed each of these issues, denied the motions to dismiss and permitted the case to go forward beyond the pleading stage.[3]
This is the first such case filed in a New Jersey state court. In the complaint, plaintiffs Mayor Sharpe James and the City of Newark (hereinafter referred to collectively as the City) name twenty-eight gun manufacturers, two trade associations and two distributors or retailers as party defendants. The complaint is in nine counts, advancing the following causes of action: defective and negligent design by defendant-manufacturers (count one); defendant-manufacturers' failure to include safety devices (count two); all defendants' failure to provide adequate warnings that guns were unreasonably dangerous (count three); negligent marketing and distribution by all defendants (count four); defendant-trade associations' negligence in failing to develop safer guns (count five); all defendants' creation of a public nuisance (count six); unjust enrichment of all defendants (count seven); punitive damages (count eight); and all defendants' liability under the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11 (count nine).
Seventeen of the gun manufacturers and a distributor/ retailer, defendant Navy Arms Company, Inc., moved to dismiss the complaint for failure to state a claim. R. 4:6-2(e). The two trade associations, defendants National Shooting Sports Foundation, Inc. and Sporting Arms and Ammunition Manufacturing Institute, Inc., filed a separate motion to dismiss for lack of personal jurisdiction and for failure to state a claim.[4]R. 4:6-2(b) and -2(e). By order dated January 8, 2002, Judge Minuskin dismissed the counts sounding in strict liability and unjust enrichment (counts one, two, three, seven and nine). However, he denied the motion as to the City's negligence, public nuisance and punitive damage claims (counts four, five, six and eight).
By leave granted, sixteen of the twenty-eight gun manufacturers and two distributors/retailers have appealed from the order denying their motion to dismiss. The City has not cross-appealed dismissal of the strict liability and unjust enrichment counts.
We affirm. At this posture of the case we are not concerned with the City's ability to prove the facts alleged in its complaint. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989). Our role is to decide whether, indulgently read, "`the fundament of a cause of action may be gleaned'" from the pleadings, ibid. (quoting Di Cristofaro v. Laurel Grove Mem. Park, 43 *35 N.J.Super. 244, 252, 128 A.2d 281 (App.Div.1957)), giving the City the benefit of all reasonable factual inferences that the allegations support. F.G. v. MacDonell, 150 N.J. 550, 556, 696 A.2d 697 (1997). Applying that standard, we agree with the trial judge that the City should be permitted to go forward with its claims of negligence, public nuisance and punitive damages. We reject defendants' arguments that, based on the pleadings, the City's alleged damages are too remote from defendants' conduct to satisfy the proximate cause requirement as a matter of law. We also reject their argument that the City's pleadings do not set forth a cognizable claim of public nuisance.

I
We first set forth the allegations in the complaint supporting the City's claim of negligence against defendants. It charges defendants with encouraging an alleged illegal gun market, which foreseeably has fueled crime in Newark and caused the City to expend significant government funds on "police protection, overtime, emergency services, coroner and morgue services, pension benefits, health care, social services and other necessary facilities and services ... due to ... the ... distribution, promotion and sale of guns." In the portion of the complaint labeled "FACTUAL ALLEGATIONS," the City states:
86. For many years, Defendants knew or should have known that by distributing firearms without adequate supervision and regulation they were creating, maintaining, or supplying the unlawful market in firearms.
87. For many years, Defendants knew or should have known that they were producing and selling substantially more firearms than could be justified by the legitimate gun market, and that a substantial portion of their guns would end up in the hands of criminals and other irresponsible persons.
The City adds:
Defendants knew or should have known that:
(a) they were producing, selling and distributing handguns in the United States without adequate or reasonable supervision, regulations, restraints or limitation,
(b) they were producing, selling and distributing handguns in the United States with the knowledge that many of their guns could not be expected to be lawfully acquired, possessed and used by responsible persons, and would come into the possession of criminals and other irresponsible persons;
(c) they were distributing, promoting, advertising, and marketing handguns in a manner such that it was reasonably foreseeable that handguns would be acquired by unauthorized and irresponsible persons, and/or that they would be used and/or stored irresponsibly;
(d) the production, marketing, and distribution of handguns, without such adequate or reasonable supervision, regulation, restraints, or limitations, created, maintained, with the foreseeable result being that this would supply the unlawful market in handguns;
....
(f) a substantial portion of the handguns they produced, sold and distributed ended up in criminal hands, and were used for criminal purposes;
(g) as a result of the foregoing, many people would be killed and injured with handguns, and others, including the City, would suffer damages as a result.
*36 As to the City's public nuisance claim, it alleges that:
134. Defendants intentionally and recklessly design, market, distribute and sell firearms to persons whom Defendants should know will bring those firearms into Newark, causing these firearms to be possessed and used in Newark illegally, which results in increased crime, injury and death to Newark citizens, as well as a higher level of fear to the residents of Newark. This conduct therefore creates an unreasonable interference with the exercise of the common rights of the health, safety and welfare to the citizens of Newark.....
140. Defendants' conduct in designing, marketing, distributing and selling firearms to persons whom Defendants' know will cause those firearms to end up in Newark is of a constant and continuing nature.
141. Defendants' conduct constitutes a nuisance as thousands of the firearms produced by Defendants will be illegally trafficked into Newark, illegally possessed and illegally used in Newark and will remain illegally in the hands of persons until the illegal possession of these firearms is detected.
142. The Defendants know that their actions interfere with the citizens of Newark's public health, safety and welfare and the public's right to be free from unnecessary danger.
....
144. The Defendants' conduct is a direct and proximate cause of violence, injury, and death to Newark residents as well as an unreasonable interference with the safety, health and welfare of the citizens of Newark as well as the public's right to be free from danger.
145. Defendants' conduct, if not stopped, will continue to pose an interference to the health, safety and welfare of the citizens of Newark.
146. The actions and inactions of the Defendants have resulted in numerous incidents of violence and death further resulting in significant costs to the City of Newark in order to enforce the laws and to treat the victims of crimes facilitated through the use of Defendants' firearms.
In a thoughtful and comprehensive written opinion, Judge Minuskin first rejected defendants' argument that they owed no duty of care to the City. In finding that a duty exists, the judge considered pertinent policy factors, including the inherent dangerousness of handguns, as well as the public's concern about gun safety, as evidenced by the "minute and careful statutory regulation" of the gun industry. Citing actions against gun manufacturers in other jurisdictions, the judge observed that "on the precise facts involved, a substantial number of courts have determined that a cause of action in negligence passed muster." As to the public nuisance claim, the judge adopted the definition set forth in Restatement (Second) of Torts § 821B (1979), and concluded:
The allegations of the Complaint come precisely within the [R]estatement definition. A nuisance may exist even though the creator conducted an entirely lawful enterprise. A municipality may institute an action to abate a nuisance or for damages. Defendants argue that nuisance actions are predicated on misuse of land and not on a factual context of this kind. Defendants' brief asserts that a very large number of cases were examined without finding a single case such as this. However, while this may be accurate, there are no cases which hold that a plaintiff's nuisance action such as this may not be brought. Clearly, the action fits within the general *37 principles of nuisance actions herein, and applying the rule against dismissal of causes of action at their inception, the Defendants' motion as to the nuisance claim must be denied.
[Citations omitted.]
Acknowledging that the City must prove "control" over the offending conduct, the judge nevertheless concluded that "control" is a fact-sensitive issue and must be resolved by the fact finder.
Finally, the judge addressed defendants' standing, proximate cause and remoteness arguments, and concluded that the City had a sufficient, direct pecuniary interest to have standing, and that the proximate cause and remoteness issues were fact-sensitive and must be left for resolution by the jury.

II

PROXIMATE CAUSE
Defendants argue that the City's claims fail as a matter of law because its damages are too remote from defendants' alleged conduct to establish proximate cause. They contend that this principle of "remoteness" applies where the conduct complained of "is at most an indirect cause of the alleged harm"; that is, where: (1) the harm is not the "natural and proximate result" of the alleged tortious conduct; or (2) plaintiff's harm flows merely from the harm visited upon a third person. For this proposition, defendants cite Camden County, supra, 123 F.Supp.2d 245, City of Philadelphia, supra, 126 F.Supp.2d 882; and Ganim, supra, 258 Conn. 313, 780 A.2d 98.
In Camden County, the District Court addressed the "remoteness" defense under the rubric of standing. See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 921 (3rd Cir.1999) ("the standing analysis ... is drawn from common-law principles of proximate cause and remoteness of injury..."), cert. denied, 528 U.S. 1105, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000). As in this case, the County alleged generally that defendant gun manufacturers purposefully or negligently produced and distributed more handguns than they reasonably expected to sell to law-abiding purchasers, thereby feeding a known, illegal secondary market. Camden County, supra, 123 F.Supp.2d at 250-51.
In granting defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the federal analog to our Rule 4:6-2(e), the Camden County court reasoned that the standing analysis required an inquiry as to the causal connection between the County's injuries and defendants' conduct. Id. at 256-57 (citing Holmes v. Securities Investor Prot. Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532, 544 (1992)). Observing that, because of the "sheer number of links in the causal chain" between the County's injuries and the defendants' conduct, it was "helpful" to apply the six-factor, proximate-cause analysis utilized by the United States Supreme Court in Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 537-45, 103 S.Ct. 897, 908-12, 74 L.Ed.2d 723, 737-43 (1983). Id. at 258. The six factors identified by Associated, a federal antitrust case, were condensed by the Third Circuit in Steamfitters:
(1) the causal connection between defendant's wrongdoing and plaintiff's harm; (2) the specific intent of defendant to harm plaintiff; (3) the nature of plaintiff's alleged injury (and whether it relates to the purpose of the antitrust laws, i.e., ensuring competition within economic markets); (4) "the directness or indirectness of the asserted injury"; (5) whether the "damages claim is ... *38 highly speculative"; and (6) "keeping the scope of complex antitrust trials within judicially manageable limits," i.e., "avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."
[17] F.3d at 924 (quoting Associated, supra, 459 U.S. at 537-38, 540, 542-44, 103 S.Ct. at 908-09, 74 L.Ed.2d at 737-39, 740-42).]
Applying the six factors, the Camden County court concluded that "proximate cause is lacking...." 123 F.Supp.2d at 264. In reaching that conclusion, it made the following findings relevant to the standing/proximate cause issue: (1) the "causal connection" was "weak" because of the multiple, intervening links between defendants' manufacturing of guns and the use of the guns by the criminal element, id. at 259; (2) all of the damages suffered by the County were "indirect" and derivative of the injuries suffered by the victims of gun violence and, even if part of the damages claimed by the County were for "direct" injuries, the County could not separate with reasonable certainty the cost of normal crime prevention and the costs attributable to the conduct of defendants, id. at 262; and (3) the County's damages were speculative and difficult to measure, and any attempt to allocate fault and damages among the defendants would require undue expenditure of judicial resources. Id. at 263.
In City of Philadelphia, supra, 126 F.Supp.2d at 903-05, the District Court, again applying the antitrust standing analysis, also found that the negligence-based claim of the City failed for lack of proximate cause because its alleged injuries were too remote from defendants' alleged conduct. In Ganim, supra, 780 A.2d at 121-30, the Connecticut Supreme Court reached a similar result in the City of Bridgeport's action against various gun manufacturers and trade associations.
We are of the view that the antitrust analysis applied by the federal and Connecticut courts does not fit squarely in a case, as here, involving application of traditional tort concepts under New Jersey law. As the Court observed in Holmes, one of the "central" elements of proximate cause under federal antitrust law has been the "direct[ness]" of the relationship between "the injury asserted and the injurious conduct alleged." Holmes, supra, 503 U.S. at 268-69, 112 S.Ct. at 1318, 117 L.Ed.2d at 544-45. Measuring "direct[ness]" in the context of anti-competitive conduct and damages does not necessarily square with contemporary tort doctrine, one objective of which "is to ensure that innocent victims have avenues of legal redress, absent a contrary overriding policy." People Express Airlines, Inc. v. Consolidated Rail Corp., 100 N.J. 246, 254-55, 495 A.2d 107 (1985). This policy reflects our State's overarching policy "that wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct." Id. at 255, 495 A.2d 107. Nevertheless, we address defendants' remoteness argument in the context of the antitrust analysis they claim is applicable.
We start by considering the standard applicable to a motion to dismiss for failure to state a claim under Rule 4:6-2(e). The issue here is whether this case is one of the "rarest of instances," Printing Mart-Morristown, supra, 116 N.J. at 772, 563 A.2d 31, meriting dismissal of the complaint on the pleadings. If so, we must be persuaded that the allegations as to cause-in-fact contained in the complaint, giving the City the benefit of all reasonable factual inferences that those allegations support, F.G., supra, 150 N.J. at 556, *39 696 A.2d 697, are insufficient as a matter of law to set forth a negligence claim.
As a general proposition, plaintiff must prove "causation in fact"; that is, the result complained of would not have occurred "but for" the negligence of defendant. Conklin v. Hannoch Weisman, 145 N.J. 395, 417, 678 A.2d 1060 (1996). "A proximate cause need not be the sole cause of harm. It suffices if it is a substantial contributing factor to the harm suffered." Perez v. Wyeth Labs., Inc., 161 N.J. 1, 27, 734 A.2d 1245 (1999). In other words, a tortfeasor will be held accountable if its negligent conduct was a substantial factor in causing the injury even when there are other "intervening causes which were foreseeable or were normal incidents of the risk created." Rappaport v. Nichols, 31 N.J. 188, 203, 156 A.2d 1 (1959). This substantial factor test "accounts for the fact that there can be any number of intervening causes between the initial wrongful act and the final injurious consequence and does not require an unsevered connecting link between the negligent conduct and the ultimate harm." Conklin, supra, 145 N.J. at 420, 678 A.2d 1060. Consequently, the fact that there may be, as defendants assert, multiple links between defendants' conduct and the ultimate harm suffered by the City does not necessarily cancel out cause in fact as a matter of law, given our settled rules respecting foreseeability and concurrent causes.
For example, the defendants' remoteness argument is framed as follows:
[T]he City alleges that defendant manufacturers produce guns, and then lawfully sell them to licensed independent wholesalers, who in turn lawfully sell them to licensed retail dealers, who in turn sell them to individual customers whose purchase has been approved by federal or state authorities. Only after all these transfers are the guns allegedly acquired by criminals or others who cause actual or threatened harm to members of the public which, in turn, harms the City. The manufacturer at one end of the causal chain is far separated from the alleged harm to the City at the other end of the chain. This causal chain becomes even more attenuated where, for example, there are several lawful or unlawful transfers after the retail dealer sells a gun to the first purchaser or where, within this chain of transfers, the gun is stolen.
This analysis might be dispositive if the City had claimed that defendants in fact control, or reasonably could control, the criminal conduct of the ultimate user. The issue under such a scenario would be whether one or all of the intervening steps cited by defendants severed the causal link between defendants' conduct and plaintiff's harm, sufficient to negate proximate cause.
However, based on the City's pleadings, the multiple "links" that form defendants' remoteness argument in fact fold into a single link. The City alleges that defendants purposely or negligently flood the gun market, knowing that their steady supply of guns will feed or facilitate the illegal sale of weapons to criminals and other unlawful users. Indulgently read, its allegations further charge that defendants individually and collectively failed to develop and in fact discourage the development of reasonable safeguards over the distribution scheme, and that defendants refuse to oversee or supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market. This conduct, the City asserts, is a natural and proximate cause of its injury.[5]
*40 As noted, at this posture of the case, we are not concerned with the City's ability to prove the facts as alleged in the complaint. Printing Mart-Morristown, supra, 116 N.J. at 746, 563 A.2d 31. The City, of course, is left to its proofs to establish not only the truthfulness of its factual allegations, but also that defendants' conduct individually or in consort was a substantial factor in causing its economic injuries. Whether or not the City survives summary judgment or a motion for judgment of involuntary dismissal at trial will depend on the quality of its proofs adduced through discovery and its trial evidence. As Judge Minuskin observed in this case:
With no more than paper allegations and a complete absence of discovery, it would be manifestly unfair to bar [the City] from attempting to present appropriate evidence to bridge the gap between breach of duty and damages.
We agree.
Defendants further argue that "remoteness defeats proximate cause where the alleged harm to [the City] flows merely from harm to a third person." Defendants reason that, "[a]part from the `tortured path' from conduct to harm, all of the alleged harm to the City is derivative. It is not the City who is shot. It is the `citizens' and `residents' of the City." For this proposition, defendants cite Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229 (2nd Cir.1999), cert. denied, 528 U.S. 1080, 120 S.Ct. 799, 145 L.Ed.2d 673 (2000).
In Laborers, labor union health and welfare trust funds (Funds) brought suit against several tobacco companies and their agents, advancing a RICO[6] claim, and various common-law claims. Id. at 232-33. The gravamen of the complaint was that the tobacco companies had engaged in deceptive practices and misled the public and the Funds specifically as to the true extent of the dangers that smoking poses to good health. Id. at 233. The Funds charged active concealment by defendants of defendants' own ability to produce a safer product. Ibid. The Funds' damage claim was for the millions of dollars they had expended for the medical treatment given to thousands of their participants who suffer from tobacco-related disease. Ibid.
In resolving the issue of proximate cause, the Laborers court quoted Holmes, which observed that "`a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover.' " Id. at 235 (quoting Holmes, supra, 503 U.S. at 268-69, 112 S.Ct. at 1318, 117 L.Ed.2d at 544). The Holmes Court articulated three policy factors to guide a court's standing/proximate cause analysis in RICO cases:
First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts *41 to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general.
[Id. at 269-70, 112 S.Ct. at 1318, 117 L.Ed.2d at 545 (citations omitted).]
Applying the Holmes "indirect" injury test, the Laborers court concluded that the Funds'
damages are entirely derivative of the harm suffered by plan participants as a result of using tobacco products. Without injury to the individual smokers, the Funds would not have incurred any increased costs in the form of the payment of benefits, nor would they have experienced the difficulties of cost predication and control that constituted the crux of their infrastructure harms. Being purely contingent on harm to third parties, these injuries are indirect. Consequently, because defendants' alleged misconduct did not proximately cause the injuries alleged, plaintiffs lack standing to bring RICO claims against defendants.
[Laborers, supra, 191 F.3d at 239.]
Other federal courts applying this analysis have reached the same result in other labor fund cases. See Service Employees Int'l Union Health & Welfare Fund v. Philip Morris, Inc., 249 F.3d 1068, 1071 n. 2 (D.C.Cir.), cert. denied, 534 U.S. 994, 122 S.Ct. 463, 151 L.Ed.2d 380 (2001); Steamfitters, supra, 171 F.3d at 933.
In our view, Laborers is distinguishable. Here, the City is not alleging that it has suffered economic damages for the medical treatment of injuries arising out of illegal gun use. The City's entire claim is bottomed on the cost of governmental services. Those costs are entirely distinct and separate from the medical expenses incurred in the treatment of the victims of gun violence. Indeed, the City's direct expenditures in investigating a gun-related crime occurring within its jurisdiction may involve no injury at all. Accord Cincinnati, supra, 768 N.E.2d at 1148-49 (holding that even if no one was shot by defendants' guns, the City may sustain damages resulting from increased law enforcement, security and other related services, all resulting from defendants' alleged fueling of an illegal weapons market).
Moreover, the governmental cost of deterring illegal use of firearms is unrelated to the injuries that may ultimately occur to victims, when the deterrent efforts of the City are unsuccessful. Expenditure of public funds to police public schools and the City's streets in accordance with a deterrence policy is hardly an "indirect" injury. Indeed, deterrence, investigation of gun crimes, and other related services are governmental activities the City is compelled by law to undertake in order to protect the welfare of its citizens. This public service cannot fairly be compared to the "service" provided by the union funds to their participants, who presumably pay in some fashion for the services rendered.[7]
*42 We find support for our conclusion in Cincinnati, supra, 768 N.E.2d at 1136. In Cincinnati, the Ohio Supreme Court reversed an order dismissing for failure to state a claim the City's cause of action against gun manufacturers, trade associations and a distributor. The Court held that the allegations in the City's complaint had set forth a negligence-based cause of action and rejected defendants' argument that the City's alleged harm was too remote and wholly derivative of harm to others. Id. at 1149. The Court treated this issue as one of standing, and it ruled that Cincinnati had standing because it alleged harm to itselfin the form of increased costsas opposed to harm that was merely derivative of injuries to others. Id. at 1147-48. It noted that, even if no one was shot by the defendants' guns, the city could sustain the kind of damages it claimedincreased law enforcement, security, prison costs, social servicesall resulting from the defendants' alleged fueling of an illegal weapons market. Id. at 1148. The Court further perceived no difficulty with respect to proving damages, as the City "is seeking recovery, in part, for police expenditures and property repairs, which can be easily computed." Id. at 1149.
Similarly, in White v. Smith & Wesson, 97 F.Supp.2d 816 (N.D.Ohio 2000), the District Court held that the City of Cleveland had alleged an "injury in fact" to itself that was not too remote and derivative, and that the injury was "fairly traceable" to alleged misconduct by the defendant gun manufacturers. Id. at 824-25. Framing the remoteness argument in the context of duty, rather than proximate cause, the White court held that it was for the jury to decide whether the gun manufacturers breached a duty of care to protect against injuries that were foreseeable. Id. at 828-29.
Finally, we are not persuaded that the policy reasons advanced by Holmes support a finding of remoteness in this case. See Holmes, supra, 503 U.S. at 269-270, 112 S.Ct. at 1318-19, 117 L.Ed.2d at 544-45. By examining the City's complaint "with a generous and hospitable approach," Printing Mart-Morristown, supra, 116 N.J. at 746, 563 A.2d 31, we must give the City the benefit of the doubt and allow it to establish through discovery that its damages are, to a degree of reasonable probability, attributable to defendants' violations "as distinct from other, independent factors." Holmes, supra, 503 U.S. at 269, 112 S.Ct. at 1318, 117 L.Ed.2d at 545. Further, unlike Holmes, this case does not involve complicated apportionment of damages among plaintiffs. Ibid. Here, the only plaintiff is the City. Indeed, in this case there is no other party available to seek redress for the loss of public monies suffered by the City. Finally, while this case may ultimately raise complicated apportionment of damage issues among the defendants, that impediment should be the subject of pretrial or trial motions, not a basis to dismiss the City's claim on its pleadings as a matter of law. We note parenthetically that in other contexts, our courts have articulated apportionment methodologies involving multiple defendants. See James v. Bessemer Processing Co., 155 N.J. 279, 312-13, 714 A.2d 898 (1998); Sholtis v. American Cyanamid Co., 238 N.J.Super. 8, 26-28, 568 A.2d 1196 (App.Div.1989). We express no view as to whether the approach taken in those cases should apply here.
*43 In rejecting an analysis of causation in the context of antitrust law, we do not suggest that resolution of the cause-in-fact and "indirect" injury issues is the end of the matter. There remains the question whether defendants' conduct, based on considerations of fairness and policy, may, as a matter of law, be considered a proximate cause of the City's injury. See Griesenbeck v. Walker, 199 N.J.Super. 132, 139, 488 A.2d 1038 (App.Div.), citing Brown v. United States Stove Co., 98 N.J. 155, 173, 484 A.2d 1234 (1984) ("[w]hile proximate cause is generally defined as the natural and probable effect of the wrongdoing, fairness and policy also enter into an assessment of the causal relationship between the conduct and the accidental harm"), certif. denied, 101 N.J. 264, 501 A.2d 932 (1985). At bottom, the generic label "proximate cause" is a judicial tool used to limit a party's responsibility based on notions of fairness and policy. Our Supreme Court in Caputzal v. The Lindsay Co., 48 N.J. 69, 222 A.2d 513 (1966), articulated this point by quoting Dean Prosser and the Restatement (Second) of Torts:
"As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.
This limitation is sometimes, although rather infrequently, one of the fact of causation. More often it is purely one of policy, of our more or less inadequately expressed ideas of what justice demands, or of administrative possibility and convenience, none of which have any connection with questions of causation at all." (Prosser, op. cit. supra, pp. 240-41).
Thus, the current Restatement contains this qualification, very appropriate in this case:
"The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm." Restatement, Torts 2d, § 435(2).
[Id. at 78, 222 A.2d 513.]
New Jersey courts have declined to impose liability where there were "highly extraordinary" consequences resulting from defendant's conduct. In Caputzal, supra, 48 N.J. at 79, 222 A.2d 513, for example, the Court held in a product liability case that, even if a defective water softener caused the rusty discoloration of water, defendant was not liable as a matter of law for plaintiff's "highly extraordinary" and idiosyncratic heart attack brought on by anxiety at the sight of the water. However, in J.S. v. R.T.H., 155 N.J. 330, 352, 714 A.2d 924 (1998), the Supreme Court rejected defendant's argument that a wife's failure to prevent or warn others of her husband's proclivity or propensity for sexual abuse was not a proximate cause of the physical and emotional injuries suffered by his sex abuse victims. Citing the "highly extraordinary" standard under the Restatement (Second) of Torts, supra, at § 435(2), the Court concluded:
It does not seem highly extraordinary that a wife's failure to prevent or warn of her husband's sexual abuse or his propensity for sexual abuse would result in the occurrence or the continuation of such abuse. The harm from the wife's breach of duty is both direct and predictable. There is little question, here, that the physical and emotional injuries allegedly suffered by the girls are hardly *44 an extraordinary result of [the husband's] acts of molestation and that their victimization is not an extraordinary consequence of [the wife's] own negligence. [The wife's] negligence could be found to be a proximate cause of plaintiffs' injuries. See Hill v. Yaskin, 75 N.J. 139, 147, 380 A.2d 1107 (1977).
[Ibid.]
Here, as well, accepting the truthfulness of the City's pleadings, it does not seem "highly extraordinary" that defendants' alleged purposeful or negligent "feeding" of guns to an illegal secondary gun market through their manufacturing, advertising and distribution scheme would yield the criminal use of the firearms in Newark, and result in substantial harm to the City itself.
The question then becomes whether policy considerations compel a finding of no liability as a matter of law. See Perez, supra, 161 N.J. at 27, 734 A.2d 1245 ("[w]e have described proximate cause as an expression as much of policy as it is an expression of the effect of sequential events"); J.S., supra, 155 N.J. at 351, 714 A.2d 924 (same). Our Supreme Court addressed that question in Perez, supra, 161 N.J. at 21, 734 A.2d 1245, where it held that the "learned intermediary doctrine" does not apply to the direct marketing of drugs to consumers. An issue in Perez was whether, as a matter of law, the intermediary role of the physician, who writes the prescriptions for the drugs, breaks the chain of causation between the manufacturer's deceptive advertising and the consumer's injury. Id. at 26, 734 A.2d 1245. The Court held:
On balance, we believe that the patient's interest in reliable information predominates over a policy interest that would insulate manufacturers. "Products liability law is based on concepts of fairness, feasibility, practicality and functional responsibility. We have always stressed the public's interest in motivating individuals and commercial entities to invest in safety to protect workers." Zaza v. Marquess and Nell, Inc., 144 N.J. 34, 64, 675 A.2d 620 (1996). Within bounds, that policy extends to consumers of pharmaceuticals.

[Id. at 29, 734 A.2d 1245.]
Noting specific instances where a patient might be influenced by direct advertising without being warned by the manufacturer or physician of dangers to the specific user, the Court concluded:
we believe that neither the physician nor the manufacturer should be entirely relieved of their respective duties to warn.... In each case, a jury must resolve the close questions of whether a breach of duty has been a proximate cause of harm.

[Id. at 30, 734 A.2d 1245.]
The reasoning in Perez applies here. Guns are dangerous instrumentalities. In 1977, there were in excess of 32,000 deaths and 64,000 serious injuries related to the use of guns. John G. Culhane and Jean Macchiaroli Eggen, Defining A Proper Role for Public Nuisance Law in Municipal Suits Against Gun Sellers: Beyond Rhetoric and Expedience, 52 S.C.L.Rev. 287, 288 n. 2 and n. 3 (2001). No one can seriously debate the issue. New Jersey has a strong public interest in protecting the public from the violence and social cost associated with the criminal misuse of firearms. In our view, such a policy would be undermined by concluding that, solely on the basis of the pleadings, defendants should be insulated from liability as a matter of law.

III

STANDING
As noted, the Courts in Camden County and Ganim addressed plaintiffs' standing *45 in the context of proximate cause. Camden County, supra, 123 F.Supp.2d at 256-65; Ganim, supra, 780 A.2d at 118-29. For the reasons we have already expressed, we decline to apply the antitrust standards utilized by the federal courts in resolving the standing issue.
In deciding a question of standing, New Jersey courts must "balance conflicting considerations and weigh questions of remoteness and degree." Walker v. Stanhope, 23 N.J. 657, 661, 130 A.2d 372 (1957). See also Interchange State Bank v. Veglia, 286 N.J.Super. 164, 177, 180-81, 668 A.2d 465 (App.Div.1995) (applying the federal antitrust remoteness analysis in finding plaintiff had no standing to assert a state RICO claim because federal courts have so held under federal RICO statute), certif. denied, 144 N.J. 377, 676 A.2d 1092 (1996). However, "New Jersey cases have historically taken a much more liberal approach on the issue of standing than have the federal cases." Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 101, 275 A.2d 433 (1971) (and cases cited therein).
Our courts have deemed "the threshold for standing to be fairly low." Reaves v. Egg Harbor Township, 277 N.J.Super. 360, 366, 649 A.2d 904 (Ch.Div.1994); see also Triffin v. Somerset Valley Bank, 343 N.J.Super. 73, 81, 777 A.2d 993 (App.Div.2001) (same). Standing "involves a threshold determination which governs the ability of a party to initiate and maintain an action before the court." Triffin, supra, 343 N.J.Super. at 80, 777 A.2d 993 (citing In re Adoption of Baby T., 160 N.J. 332, 340, 734 A.2d 304 (1999)). New Jersey courts confer standing in those cases where the party's concern with the subject matter of litigation evidences "a sufficient stake and real adverseness." Crescent Park Tenants Ass'n, supra, 58 N.J. at 107, 275 A.2d 433. See also New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n, 82 N.J. 57, 67, 411 A.2d 168 (1980) (same). In making that determination, we give "due weight to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of `just and expeditious determinations on the ultimate merits.'" Crescent Park Tenants Ass'n, supra, 58 N.J. at 107-08, 275 A.2d 433 (emphasis added) (quoting Tumarkin v. Friedman, 17 N.J.Super. 20, 21, 85 A.2d 304 (App.Div.1951), certif. denied, 9 N.J. 287, 88 A.2d 39 (1952)). A financial interest in the outcome of litigation is ordinarily sufficient to confer standing. Associates Commercial Corp. v. Langston, 236 N.J.Super. 236, 242, 565 A.2d 702 (App.Div.), certif. denied, 118 N.J. 225, 570 A.2d 979 (1989). However, a litigant does not have standing to assert a right of a third party. Jersey Shore Med. Ctr. v. Estate of Baum, 84 N.J. 137, 144, 417 A.2d 1003 (1980).
Applying these principles, we conclude that the City has standing to prosecute this action. The City is not asserting the right of a third party; it clearly has a "sufficient stake" in seeking redress for damages to it directly attributable to defendants' conduct. In fact, no other party has a more direct interest in protecting the public fisc than the City itself. Moreover, as previously noted, the expenses incurred by the City are "direct" and independent of the costs of treating the victims of gun violence. Indeed, even the District Court in Camden County, supra, which dismissed the County's complaint on remoteness grounds, held that:
the harm alleged by the Countythe governmental costs of preventing, prosecuting and punishing handgun crimeswould exist to some extent even if no individual had been injured, and that the *46 County's alleged injury is distinguishable from that of its citizens. For instance, there are some cases where a gun-related charge is prosecuted even though no shots have been fired. The alleged costs of combating illegal gun possession do not flow solely from harm visited upon a third party; they are alleged to exist as a result of separate and direct harm defendants have visited upon the County itself. Accordingly, the County has properly alleged that it has suffered an "injury in fact."

[123 F.Supp.2d at 256.]
The Cincinnati court is in accord. See Cincinnati, supra, 768 N.E.2d at 1148.

IV

DUTY
Defendants argue that no duty of care is owed to the City because it attempts to hold defendants liable for the conduct of third parties. In such a case, defendants add, no duty exists absent a special relationship between the tortfeasor and injured party. Defendants conclude "[t]his principle precludes liability on the part of firearm manufacturers for the criminal misuse of their products by third parties."
The determination of the existence of a duty is ultimately a question of fairness and policy. J.S., supra, 155 N.J. at 339, 714 A.2d 924 (citing Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 502, 694 A.2d 1017 (1997)). Resolution of the issue requires the court to balance several factors, "including the nature of the underlying risk of harm, that is, its foreseeability and severity," defendants' ability to exercise care to prevent the harm, the relationship of the parties, and the public interest in the proposed solution. J.S., supra, 155 N.J. at 337, 714 A.2d 924. See also Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993). Of all these factors, "[f]oreseeability of the risk of harm is the fundamental element...." J.S., supra, 155 N.J. at 337, 714 A.2d 924. The foreseeability factor is predicated on the "defendant's knowledge of the risk of injury and is susceptible to objective analysis." Id. at 338, 714 A.2d 924 (citing Weinberg v. Dinger, 106 N.J. 469, 484-85, 524 A.2d 366 (1987)). Ultimately, whether or not a duty exists implicates the "`fundamental question whether the plaintiff's interests are entitled to legal protection against defendant's conduct.'" Ibid. (quoting Weinberg, supra, 106 N.J. at 481, 524 A.2d 366 (internal quotations and citations omitted)).
The imposition of a duty thus requires an evaluation and a balancing of the conflicting interests of the respective parties. Portee v. Jaffee, 84 N.J. 88, 101, 417 A.2d 521 (1980). That assessment necessarily includes an examination of the relationship between and among the parties. Also implicated in this analysis is an assessment of the defendant's "responsibility for conditions creating the risk of harm" and an analysis of whether the defendant had sufficient control, opportunity, and ability to have avoided the risk of harm. Kuzmicz v. Ivy Hill Park Apts., Inc., 147 N.J. 510, 515, 688 A.2d 1018 (1997); Carvalho[ v. Toll Bros. & Developers], supra, 143 N.J. [565] at 573, 675 A.2d 209 [1996].

[Id. at 338-39, 714 A.2d 924.]
In City of Philadelphia, 126 F.Supp.2d at 898-902, the District Court held that gun manufacturers owed no duty under Pennsylvania law to the City to protect its citizens from the unlawful use of firearms by third parties. In affirming, the Third Circuit agreed. 277 F.3d 415, 425-26 (3rd Cir.2002). However, other courts addressing the duty issue have held to the contrary. Cincinnati, supra, 768 N.E.2d at *47 1144-45; White, supra, 97 F.Supp.2d at 828-29. We agree with the courts in Cincinnati and White.
Based on the City's pleadings, it charges that defendants know or reasonably should foresee the risk of harm, and severity of the harm, associated with illegal use of their products. J.S., supra, 155 N.J. at 337, 714 A.2d 924. As Judge Minuskin observed, the dangerous propensity of handguns is self-evident, and the consequence of their misuse is well documented. It takes no undue leap of logic to conclude that defendants should reasonably foresee the resulting governmental costs associated with such misuse. Ibid.
Although vigorously disputed by defendants, the City claims that defendants know of the existence of the illegal gun market, and have the ability to exercise care to prevent the resulting harm by imposing a more supervised scheme of distribution. The societal interest in the proposed solution is self-evident; defendants will have the incentive to diminish the potential harm to the City and its inhabitants if liability is imposed. Ibid.
Finally, we reject defendants' argument that no duty exists because there is no special relationship between the City and defendants. In Clohesy, supra, the Court held that, when the risk of harm is that posed by third parties, plaintiff may be required to demonstrate that defendant was in a position to "`know or have reason to know, from past experience, that there [was] a likelihood of conduct on the part of third persons in general which was likely to endanger the safety'" of another. 149 N.J. at 507, 694 A.2d 1017 (quoting Restatement (Second) of Torts, supra, at § 344 comment (f)). See also J.S., supra, 155 N.J. at 338, 714 A.2d 924. In our view, the City's pleadings satisfy that test.

V

ARGUMENTS OF AMICUS CURIAE
Amicus Product Liability Advisory Council, Inc. (PLAC) argues that: (1) the City lacks statutory authority to sue to abate a public nuisance, since an action can be brought only by the State; and (2) the City's claim for damages is barred by the so-called "Municipal Cost Recovery Rule," also known as the "Free Public Services Doctrine." Neither of these contentions was asserted by defendants as part of their motion to dismiss in the trial court, nor are they advanced or discussed in defendants' appellate briefs. "An amicus curiae may not interject new issues, but must accept the issues as framed and presented by the parties." Federal Pacific Elec. Co. v. New Jersey Dep't of Envtl. Prot., 334 N.J.Super. 323, 345, 759 A.2d 851 (App.Div.2000). Nevertheless, we address the issues.
PLAC cites N.J.S.A. 2A:54A-1 for the proposition that public nuisance litigation must be in "the name of the state." The statute cited refers to the Attorney General's or prosecutors' powers to institute a civil action to abate a nuisance as defined in N.J.S.A. 2C:33-12. That section of the Criminal Code refers to conduct "which engenders the safety or health of a considerable number of persons." N.J.S.A. 2C:33-12a. However, neither statute expressly precludes a municipality from filing an action to abate a public nuisance of any nature within its own territory.
A municipality's right to abate a nuisance is derived from its "police power." See Township of Andover v. Lake, 89 N.J.Super. 313, 319, 214 A.2d 870 (App.Div.1965) (it is an entirely proper exercise of police power to protect the health, safety and welfare of local residents by abatement of nuisances); see also N.J.S.A. *48 40:48-2 (vesting in municipalities legislative police power to adopt ordinances in order to protect the general welfare); Mayor & Council of Borough of Alpine v. Brewster, 7 N.J. 42, 53, 80 A.2d 297 (1951) (a municipality's police power to legislate in order to protect the general welfare of its citizens "comprehends the power to make such laws effective").[8] A municipal body also has a common-law right to abate a public nuisance by summary proceedings. Ajamian v. Township of North Bergen, 103 N.J.Super. 61, 72-73, 246 A.2d 521 (Law Div.1968), aff'd, 107 N.J.Super. 175, 257 A.2d 726 (App.Div.1969), cert. denied, 398 U.S. 952, 90 S.Ct. 1873, 26 L.Ed.2d 292 (1970); Weil v. Ricord, 24 N.J. Eq. 169, 173 (Ch. 1873); see also 6A McQuillin Mun. Corp. § 24.65 (3rd 1997).
Amicus also contends that the "Municipal Cost Recovery Rule," precludes the City from recovering damages in this case. This rule holds that a public body cannot recover the cost of governmental emergency services necessitated by a tortfeasor's conduct, absent legislative authority. In re Oil Spill by the Amoco Cadiz, 954 F.2d 1279, 1310 (7th Cir.1992); City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co., 719 F.2d 322, 323-24 (9th Cir.1983). The policy underpinning to the rule is that the government has chosen to bear the cost of such expenditures, and any change in that "fiscal policy" should be addressed by the Legislature, rather than the courts. Flagstaff, supra, at 719 F.2d at 324.
In support of invoking the "Municipal Cost Recovery Rule" in this case, amicus cites Township of Cherry Hill v. Conti Constr. Co., 218 N.J.Super. 348, 527 A.2d 921 (App.Div.), certif. denied, 108 N.J. 681, 532 A.2d 253 (1987). In Cherry Hill, the Township brought an action to recover expenses of $4,220.80 it had incurred in providing emergency evacuation services after the defendant ruptured a gas main while engaged in widening a highway. Id. at 349, 527 A.2d 921. We affirmed dismissal of the complaint, observing that "[g]overnment has traditionally assumed the ultimate cost of providing basic emergency services that protect the community." Ibid. The court relied on the public policy expressed by the "fireman's rule" cases of spreading the risk of certain losses "by shifting from a negligent tortfeasor to the taxpayers the financial responsibility for a fireman's or policeman's economic loss resulting from an injury incurred while responding to an emergency[.]" Ibid. (citing Krauth v. Geller, 31 N.J. 270, 274, 157 A.2d 129 (1960)).
We respectfully question the continued vitality of Cherry Hill's holding, since it was bottomed on the policy of "spreading the risk" as expressed by the fireman's rule cases. The fireman's rule has now been abrogated by statute N.J.S.A. 2A:62A-21. In any event, Cherry Hill involved a single incident, resulting in a nominal expense to the municipality. We do not accept the proposition that its reasoning should apply in a case such as this, where the City claims a repeated *49 course of conduct on defendants' part, requiring the City to expend substantial governmental funds on a continuous basis. Finally, there is authority for the proposition that the Municipal Cost Recovery Rule does not apply to cases, as here, where a municipality seeks to recover damages for the cost of abating a nuisance. Flagstaff, supra, 719 F.2d at 324. See also David C. McIntyre, Tortfeasor Liability for Disaster Response Costs: Accounting for the True Cost of Accidents, 55 Fordham L.Rev. 1001, 1023 n. 129 (1987) (and cases cited therein).
Further, the rule has been subject to recent criticism, given the economic realities faced by cities, and the unfairness of the notion that taxpayers must subsidize the conduct of industrial tortfeasors. Timothy D. Lytton, Should Government Be Allowed to Recover the Costs of Public Services From Tortfeasors?: Tort Subsidies, the Limits of Loss Spreading, and the Free Public Services Doctrine, 76 Tulane L.Rev. 727, 728 (2002). The rule "should be eliminated" because it "shields industrial tortfeasors from liability ..., constitutes a tort subsidy to industry and functions as an insurance scheme for industrial accidents paid for by taxpayers." Id. at 730. The commentator ultimately focuses on fairness:
First, [the rule] unjustifiably favors tortfeasors who harm government as compared to those who harm private parties. Second, it imposes the losses caused by this favored class of tortfeasors on taxpayers. In many instances, the doctrine lets industrial tortfeasors off the hook for forest fires, oil spills, and airline crashes and makes taxpayers pay the cleanup costs.
[Id. at 759.]
See also David C. McIntyre, supra, 55 Fordham L.Rev. at 1005-06 (the rule "may not be the most equitable solution to the problem ... in modern society," given the "recent cuts in federal revenue-sharing programs" and "local municipalities ... facing very tight budgets"). Finally, without eliminating the rule, industrial tortfeasors have no incentive to purchase general liability insurance to cover the cost of the public services. Timothy D. Lytton, supra, 76 Tulane L.Rev. at 766.
We endorse the reasons expressed by the commentators. Here, if the City has a worthy claim, application of the Municipal Cost Recovery Rule leaves it without a remedy. If tortious conduct exists, the consequence is that the gun manufacturers are subsidized for their wrongful acts, and the cost of the governmental services must be borne by the taxpayers of the City. This result is fundamentally unfair, given the City's limited resources and strained ability to provide other essential services to its citizens. Application of the rule also serves as a disincentive; if culpable, the insulated defendants have no reason to obtain liability insurance to cover the cost of their conduct, or to take reasonable measures to eliminate, or at least reduce, the harm resulting from the use of their product.
Amicus, National Association of Manufacturers (NAM) argues that the complaint should be dismissed for an additional reason not offered by defendants: in reality the complaint states causes of action that sound in products liability, which, therefore, must be decided under the Products Liability Act. Thus, NAM reasons, plaintiffs were required to show that the handguns were not reasonably fit for their intended purpose, and the judge erred in allowing the City's claim to proceed on a public-nuisance theory instead. We reject the argument.
As we have noted, all of the counts in the City's complaint sounding in strict liability were dismissed by the trial judge.
*50 The remaining claims, negligence and public nuisance, do not focus on the design defects of defendants' product or defendants' failure to warn of its dangerous propensities. Rather, the negligence-based and nuisance claims are predicated on defendants' conduct; their purposeful or negligent "feeding" of their product to an illegal gun market. Whether or not the City establishes a prima facie case based on these theories will not, in any way, be based on product liability law.

VI

NUISANCE
Defendants argue that cases cited under New Jersey law limit public nuisance claims to instances involving: (1) a nexus with, or a defendant's use or effect upon real property; or (2) violations of statutes or ordinances.
A private nuisance involves interference with another's interest in the private use and enjoyment of land. Restatement (Second) of Torts, supra, at § 822; Prosser & Keeton on Torts, § 91 at 652 (5th ed.1984). "Unlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land." Restatement (Second) of Torts, supra, at § 821B comment h; Prosser & Keeton on Torts, supra, § 90 at 643 (a public nuisance "encompasses much conduct other than the type that interferes with the use and enjoyment of private property"). For example:
there are those activities that are a "public nuisance" because the defendant is engaged in a continuing course of conduct that is calculated to result in physical harm or economic loss to so many persons as to become a matter of serious concern. Such activities as practicing law or medicine without a license would be included in this category.

[Prosser & Keeton, supra, § 90 at 651-52.]
Defendants have cited no New Jersey case that holds to the contrary. Indeed, in the context of actions against gun manufacturers, even the Court in Camden County, although rejecting the County's nuisance claim on other grounds, observed that "[a] claim for public nuisance `may lie even though neither the plaintiff nor the defendant acts in the exercise of private property rights.'" Camden County, supra, 123 F.Supp.2d at 264 (quoting Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 315 (3rd Cir.), cert. denied, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985)).
Defendants contend that, absent a nexus with the use of land, public nuisance claims are limited to a violation of statutes or ordinances.
Section 821B of the Restatement (Second) of Torts provides:
(1) A public nuisance is an unreasonable interference with a right common to the general public.
(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.
By its very terms, § 821B does not confine "unreasonable" interference to conduct that is proscribed by statute or other legislative *51 act. See id. at § 821B comment e (the three categories under § 821B(2) of "unreasonable" interference are listed in the disjunctive; any one may warrant a holding of unreasonableness).
We agree with defendants' additional argument that, in addition to a violation of a statute, regulation or ordinance, a public nuisance may exists if the conduct complained of involves a "significant interference" with the public welfare or "is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." Id. at § 821B(2)(a) and (c) (emphasis added). The comments to § 821B suggest that each of the categories of "unreasonable" interference must implicate tortious conduct:

the defendant is held liable for a public nuisance if his interference with the public right was intentional or was unintentional and otherwise actionable under the principles controlling liability for negligent or reckless conduct or for abnormally dangerous activities. Liability was not normally imposed for a pure accident that did not fall into one of the three traditional categories of tort liability. In each of these categories, some aspect of the concept of unreasonableness is to be found. If the interference with the public right is intentional, it must also be unreasonable. If the interference was unintentional, the principles governing negligent or reckless conduct, or abnormally dangerous activities all embody in some degree the concept of unreasonableness.
[Id. at § 821B comment e (emphasis added) (citations omitted).]
We agree with Judge Minuskin that it is premature to dismiss the nuisance count in light of the definition of public nuisance under § 821B. Applying the Restatement analysis, the City's allegations at the very least plead an unreasonable interference with a right common to the general public. The pleadings clearly implicate the concept of "unreasonableness." Finally, they charge that defendants' conduct was of a "continuing nature" and had a "long-lasting effect," and that defendants knew or had reason to know the "significant effect" their conduct would have upon the City and its inhabitants.
Defendants add "[f]or good reason, courts are loath to declare as a public nuisance legal commercial conduct which complies with a `comprehensive set of legislative acts or administrative regulations governing the details of [ ... that] kind of conduct,' as in the case of firearms." The Ohio Supreme Court rejected this argument in Cincinnati, stating:
Even though there exists a comprehensive regulatory scheme involving the manufacturing, sales, and distribution of firearms, see, e.g., Section 922, Title 18, U.S.Code; Part 178, Title 27, C.F.R., the law does not regulate the distribution practices alleged in the complaint.
[City of Cincinnati, supra, 768 N.E.2d at 1143.]
Indeed, the Ganim court, which dismissed the City's nuisance claim on other grounds, agreed, stating:
We acknowledge that the definition of a common-law public nuisance is, without more, capacious enough to include the allegations of the plaintiffs' complaint. One might well say that the harms alleged by the plaintiffs to have been caused by the defendants' conduct are harms that injure the citizens of Bridgeport who may be so circumstanced as to come within the influence of that conduct.
[Ganim, supra, 780 A.2d at 132.] *52 Moreover, a recent commentator has addressed and rejected this immunity claim advanced by the gun manufacturers as follows:
[T]he government's power to civilly prevent, ameliorate, and abate a public nuisance has always extended to lawful conduct. Further, there is no basis for manufacturers, or any particular type of manufacturers, to claim immunity.
Handgun manufacturers, like the rest of us, can be held civilly liable for their conduct even if it falls within the framework and regulations of statutory law. The Restatement makes this point emphatically: "traveling at less than the speed limit may still be negligence if traffic conditions indicate that a lesser speed is required."
[David Kairys, The Governmental Handgun Cases and the Elements and Underlying Policies of Public Nuisance Law, 32 Conn. L.Rev. 1175, 1182 (2000) (quoting Restatement (Second) of Torts, supra, § 821B comment f).]
The commentator adds that while it is true that some aspects of gun sales are regulated, "the reality is that their [the gun industry's] marketing and distribution policies and practices exist in a regulatory vacuum," in that "there is generally no regulation of the quantity, frequency, or purpose of firearm purchases or sales nor is there any national registration of purchasers or firearms." Id. at 1183. Thus the specific conduct alleged to constitute the public nuisancefostering an illegal secondary gun marketis not closely regulated. Id. at 1183-84. Accord John G. Culhane and Jean Macchiaroli Eggen, supra, 52 S.C. L.Rev. at 291 ("Inasmuch as gun sale and ownership is legal, terming the conduct of gun sellers a public nuisance might seem at odds with legislative decisions. Certain practices, however, amount to public nuisances by subverting the intent of the law"). A municipality's inherent police powers would be vitiated by requiring that the offending conduct violate some specific statute. Id. at 297.
Finally, defendants argue that there is no liability for public nuisance because they do not control the tortious conduct constituting the nuisance. See State, Dep't of Envtl. Prot. v. Exxon Corp., 151 N.J.Super. 464, 483, 376 A.2d 1339 (Ch.Div.1977) ("a person is not civilly liable for a nuisance caused or promoted by others over whom he has no control....").
Defendants misinterpret the City's pleadings. As previously noted, the City does not claim that defendants have control over, or the capacity to control the illegal use of the firearms. The City charges that defendants' intentionally or negligently created and fueled an illegal gun market, thereby unreasonably interfering with the public welfare, knowing, or having reason to know, that their conduct has a significant effect upon a public right. Restatement (Second) of Torts, supra, at § 821B. The "instrumentality" defendants "control" is the creation and supply of this illegal market.
There is no requirement that a defendant have the kind of control defendants suggestactual control over the instrumentality of the nuisance at the time and place it does harm. Contributing to a public nuisance through or with the conduct of others is sufficient for liability if the defendant knew or should have known the consequences. In any event, the manufacturers do have control of the products at the pertinent time and place: they use a distribution system they established and maintain which they know or should know facilitates easy access for crime and by persons prohibited to purchase. Their public nuisance liability stems from their marketing and *53 distribution policies and practices, over which they have complete control.
[David Kairys, supra, 32 Conn. L.Rev. at 1185 (footnote omitted).]
Another commentator addressed the issue as follows: "To the extent that gun manufacturers have actual or constructive knowledge that the weapons they produce and sell are being used to fuel an illegal, secondary market, and the manufacturers take no remedial action, they contribute to the evasion of laws designed to limit the dissemination and use of firearms." John G. Culhane and Jean Macchiaroli Eggen, supra, 52 S.C. L.Rev. at 316.
We endorse these views, reject defendants' "control" argument, and conclude that Judge Minuksin properly denied defendants' motion to dismiss the nuisance claims on the pleadings.
Affirmed.
NOTES
[1] Recovering the Costs of Public Nuisance Abatement: The Public and Private City Sue The Gun Industry, 113 Harvard L.Rev. 1521, 1522 n. 2 and n. 4 (2000). Many of the cases are unreported. They may be found at www.firearmslitigation.org (the Firearms Litigation Clearinghouse).
[2] See Camden County Board of Chosen Freeholders v. Beretta U.S.A. Corp., 123 F.Supp.2d 245 (D.N.J.2000), aff'd, 273 F.3d 536 (3rd Cir.2001); City of Philadelphia v. Beretta U.S.A. Corp., 126 F.Supp.2d 882 (E.D.Pa.2000), aff'd, 277 F.3d 415 (3rd Cir.2002); Ganim v. Smith & Wesson Corp., 258 Conn. 313, 780 A.2d 98 (2001).
[3] See City of Cincinnati v. Beretta U.S.A. Corp., 95 Ohio St.3d 416, 768 N.E.2d 1136 (2002); White v. Smith & Wesson Corp., 97 F.Supp.2d 816 (N.D.Ohio 2000); City of Boston v. Smith & Wesson Corp., No. XXXXXXXXX, 2000 WL 1473568 (Mass.Super. July 13, 2000). The Boston opinion is unreported, but was relied on by Judge Minuskin, the trial judge in this case.
[4] The trade associations' appeal, by leave granted (A-3101-01T3), is the subject of a separate opinion filed simultaneously with this opinion.
[5] A main component of the illegal market is the "straw" purchases of firearms from dealers where the illegal trafficker uses a friend or relative to purchase the firearm, who is then paid with money or drugs. See Bureau of Alcohol, Tobacco & Firearms, Following the Gun: Enforcing Federal Laws Against Firearms Traffickers 1, 18 (June 2000). A recent study by the ATF demonstrated that nearly fifty percent of the agency's investigations involved firearms being trafficked by straw purchasers either directly or indirectly. Id. at 10. (www.atf.treas.gov/firearms/ycgii/1999/index.htm).
[6] Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. §§ 1961 to 1968.
[7] Although this case does not involve a direct injury to the City's own property, one commentator suggests that municipalities may have a basis to sue gun manufacturers "`to vindicate such of their own proprietary interests as might be congruent with the interests of their inhabitants.'" Recovering the Costs of Public Nuisance Abatement: The Public and Private City Sue The Gun Industry, supra, 113 Harvard L.Rev. at 1529 (quoting In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 131 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973)). An example of injury to such a "proprietary interest" is "`the harm caused by disruption of local comprehensive planning....'" Id. at 1529 (quoting American Motorcyclist Ass'n v. Watt, 534 F.Supp. 923, 932 (C.D.Cal.1981), aff'd, 714 F.2d 962 (9th Cir.1983)).
[8] In support of its argument that only the State may abate a nuisance, amicus cites Township of Howell v. Waste Disposal, Inc., 207 N.J.Super. 80, 99, 504 A.2d 19 (App.Div.1986), where the court, citing Alpine, so held. However, Alpine observed only that "[a] public nuisance is remedial on information by the attorney-general." Alpine, supra, 7 N.J. at 52, 80 A.2d 297. The Court did not foreclose a municipality from seeking such relief. In fact, the Court held that N.J.S.A. 40:55-47, now repealed, which empowered municipalities to provide by ordinance for the enforcement of its zoning ordinance, impliedly gave the municipality the power to seek injunctive relief to abate a nuisance arising from a violation of the ordinance. Id. at 53, 80 A.2d 297.