**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CANYON COUNTY, a political
subdivision of the State of Idaho,
   *Plaintiff-Appellant,*

   v.

SYNGENTA SEEDS, INC., a Delaware
corporation; SORRENTO LACTALIS,
INC., a Delaware corporation;
SWIFT BEEF COMPANY, a Delaware
corporation; HARRIS MORAN SEED
CO., a California corporation;
ALBERT PACHECO, an individual,
   *Defendants-Appellees.*

No. 06-35112

D.C. No.
CV 05-0306 EJL

OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted
August 7, 2007—Seattle, Washington

Filed March 21, 2008

Before: William C. Canby, Jr., A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Tashima

**COUNSEL**

Howard W. Foster, Johnson & Bell, Ltd., Chicago, Illinois, for the plaintiff-appellant.

George R. Wood, Littler Mendelson, P.C., Minneapolis, Minnesota, for defendant-appellee Syngenta Seeds, Inc.

Juan P. Morillo, Sidley Austin LLP, Washington, D.C., for defendant-appellee Sorrento Lactalis, Inc.

Marie R. Yeates, Vinson & Elkins LLP, Houston, Texas, for defendant-appellee Swift Beef Company.

Richard A. Leasia, Thelen Reid & Priest, LLP, San Jose, California, for defendant-appellee Harris Moran Seed Company.

Cynthia J. Wooley, Ketchum, Idaho, for defendant-appellee Albert Pacheco.

## OPINION

TASHIMA, Circuit Judge:

This case involves an Idaho county's attempt to recover damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, for additional monies it claims to have expended on public health care and law enforcement services for undocumented immigrants. Plaintiff-appellant Canyon County commenced this action against four companies and one individual under RICO's civil enforcement provision, 18 U.S.C. § 1964(c), alleging that defendants engaged in an illegal scheme of hiring and/or harboring undocumented immigrant workers within the County, and that their actions forced the County to pay "millions of dollars for health care services and criminal justice services for the illegal immigrants."

The district court concluded that the County did not have statutory standing under § 1964(c) because the County did not meet the threshold requirement that a civil plaintiff be "injured in his business or property" by reason of the alleged RICO violation. Consequently, the court dismissed the County's complaint.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court. We agree with the district court that the County has failed to allege that it was injured in its business or property. We also conclude that, with respect to almost all of the defendants' alleged RICO violations, the County cannot show that its claimed injuries were proximately caused by defendants' conduct. For both of these reasons, the County lacks statutory standing to pursue its federal RICO claims.

## BACKGROUND

### I.   Civil Enforcement Under RICO

RICO focuses on "racketeering activity," which the statute defines as a number of specific criminal acts under federal and state laws. *See* 18 U.S.C. § 1961(1). As relevant to this case, acts which are indictable under § 274 of the Immigration and Nationality Act ("INA") are included in the definition of racketeering activity. 18 U.S.C. § 1961(1)(F). INA § 274 (codified as amended at 8 U.S.C. § 1324) criminalizes the bringing in, transportation, harboring, and employment of undocumented aliens.

Substantive violations of RICO are defined in 18 U.S.C. § 1962. Under § 1962(c), it is illegal for any person "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity," where that enterprise affects interstate commerce. It is also illegal for any person to conspire to do so. 18 U.S.C. § 1962(d). A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity, as defined in 18 U.S.C. § 1961(1), within a period of ten years. 18 U.S.C. § 1961(5).[1]

---

[1] RICO violations are criminally punishable by fines, forfeiture, and imprisonment. 18 U.S.C. § 1963(a).

Under RICO's civil enforcement mechanism, "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ." 18 U.S.C. § 1964(c). To have standing under § 1964(c), a civil RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was "by reason of" the RICO violation, which requires the plaintiff to establish proximate causation. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

## II.  Canyon County's Complaint

The County's first amended complaint ("complaint") names as defendants Syngenta Seeds, Inc. ("Syngenta"), Sorrento Lactalis, Inc. ("Sorrento"), Swift Beef Company ("Swift"), Harris Moran Seed Company ("Harris"), and Albert Pacheco. Because we are reviewing the dismissal of the complaint, we assume that the factual allegations of the complaint, summarized below, are true.

According to the complaint, each of the four defendant companies knowingly employed and/or harbored large numbers of illegal immigrants within Canyon County, in an "Illegal Immigrant Hiring Scheme."[2] The companies' actions have damaged the County because the County "has paid millions of dollars for health care services and criminal justice services for the illegal immigrants who have been employed by the defendants in violation of federal law." The individual defendant, Pacheco, has engaged in a policy of "Wilful Blindness and Harboring" of illegal immigrants, in his role as director

---

[2]Each defendant apparently conducted its own separate scheme, as there are no allegations that the defendants cooperated with each other in any way.

of a local social service agency, which has resulted in similarly increased costs for the County.

Defendants Syngenta and Harris are both growers and processors of agricultural commodities. The County claims that both companies have deliberately hired hundreds of workers who the companies knew were not authorized to work in the United States. Working with a farm labor contractor, Ag Services, the companies agreed to employ undocumented immigrants supplied by Ag Services. The contractor acts as a "front" for Syngenta and Harris: in addition to supplying workers, the contractor channels the workers' wages to them, completes fraudulent I-9 employment eligibility forms for the workers, and supplies the workers with false documents. The companies have thus allegedly violated both 8 U.S.C. § 1324(a)(3),[3] which criminalizes knowing hiring of more than ten unauthorized aliens during a single year, and 8 U.S.C. § 1324(a)(1)(A)(iii),[4] which criminalizes harboring of unauthorized aliens.

The County further alleges that Syngenta and Harris have each formed an "association-in-fact enterprise" with the farm labor contractor, and that the companies' sustained custom of hiring and/or harboring undocumented workers amounts to a pattern of racketeering activity. As a consequence, the companies have allegedly violated 18 U.S.C. § 1962(c), by partici-

---

[3]Under 8 U.S.C. § 1324(a)(3)(A), it is illegal for any person "during any 12-month period, [to] knowingly hire[ ] for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) . . . ." An alien described in subparagraph B "is an alien who— (i) is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and (ii) has been brought into the United States in violation of this subsection." 8 U.S.C. § 1324(a)(3)(B).

[4]Under 8 U.S.C. § 1324(a)(1)(A)(iii), it is illegal for any person to "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, . . . harbor[ ] . . . or attempt[ ] to . . . harbor . . . such alien in any place, including any building or any means of transportation."

pating in the conduct of an enterprise's affairs through a pattern of racketeering activity.

The complaint contains similar allegations against Sorrento, a cheese processor, and Swift, a meat packer, the only difference being that Sorrento and Swift have allegedly formed "association-in-fact" enterprises with a different labor contractor, Labor Ready.

The County's claim against defendant Pacheco is distinct, as it is not based on the hiring of undocumented immigrants. Instead, the County alleges that Pacheco, in his position as Executive Director of the Idaho Migrant Council, has directed his staff to assist immigrant workers in fraudulently applying for public benefits, despite Pacheco's knowledge that the workers lacked legal status in the United States and were ineligible for such benefits. In directing his staff to take these actions, Pacheco has allegedly committed a pattern of racketeering activity, by knowingly harboring undocumented immigrants in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). Thus, based on his association with the Migrant Council, which is asserted to be a RICO enterprise, Pacheco has allegedly violated 18 U.S.C. §§ 1962(c) and 1962(d).[5]

## III.   Dismissal by the District Court

Defendants filed motions to dismiss the County's complaint, challenging both the County's standing under RICO and the adequacy of the County's allegations of substantive RICO violations. The district court granted defendants' motions and dismissed the complaint in its entirety. It held that the County lacked statutory standing to bring its federal RICO claims because it had not been injured in its business or property by the alleged conduct constituting the RICO violations.

---

[5]The complaint also charges Pacheco with violations of the Idaho Racketeering Act, Idaho Code §§ 18-7801 to 18-7805.

In evaluating whether the County had alleged injuries of a type cognizable under § 1964(c), the district court first discussed the tort doctrine known as the "municipal cost recovery rule," drawing on our decision in *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry.*, 719 F.2d 322 (9th Cir. 1983). In *City of Flagstaff*, we held that, under Arizona law, a municipality could not recover the cost of public services for fire or safety protection from a negligent tortfeasor. *Id.* at 323. We did, however, recognize several exceptions to the "municipal cost recovery rule," including exceptions allowing municipal recovery "where it is authorized by statute or regulation" and "where the acts of a private party create a public nuisance which the government seeks to abate." *Id.* at 324.

Noting that the County appeared "to concede the existence of the municipal cost recovery rule," the district court rejected the County's argument that its claims fit within either the exception for suits to abate a public nuisance, or the exception for suits authorized by statute. First, the district court stated that the County was not acting in its governmental capacity to abate a nuisance, but suing for treble damages under civil RICO. It then considered the County's argument that the RICO statute itself authorized its recovery. The court rejected this contention, citing what it characterized as "extensive persuasive authority" from other circuits to the effect that a municipality may not recover under RICO for alleged injuries to its governmental functions.

Thus, relying on the municipal cost recovery rule and on case law from other circuits, the district court concluded that the County's claim for the costs of municipal services did not qualify as an injury to business or property within the meaning of RICO. On this basis, the court dismissed the federal RICO claims against all defendants and entered judgment against the County.[6] The County timely appealed.

---

[6]Upon dismissing the federal RICO counts against all defendants, the court also dismissed the Idaho Racketeering Act claims against Pacheco without prejudice to refiling those claims in state court.

## STANDARD OF REVIEW

In reviewing dismissal of the County's complaint under Federal Rule of Civil Procedure 12(b)(6),[7] "we accept as true the factual allegations in the amended complaint." *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991, 1994 (2006). We will uphold the dismissal "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."[8] *Mendoza v. Zirkle Fruit Co.*,

---

[7]The district court did not specify whether its dismissal was based on Federal Rule of Civil Procedure 12(b)(1), lack of subject matter jurisdiction, or 12(b)(6), failure to state a claim upon which relief can be granted, noting that "the case law is unclear as to whether a challenge to a plaintiff's standing under RICO is jurisdictional." There is case law from other circuits suggesting that statutory standing may sometimes be a jurisdictional prerequisite. *See Lerner v. Fleet Bank*, 318 F.3d 113, 126-29 (2d Cir. 2003). We have held, however, that the question of statutory standing is to be resolved under Rule 12(b)(6), once Article III standing has been established. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1175 (9th Cir. 2004) ("If a plaintiff has suffered sufficient injury to satisfy the jurisdictional requirement of Article III but Congress has not granted statutory standing, that plaintiff cannot state a claim upon which relief can be granted.").

In this instance, we preliminarily conclude that the County has met Article III's jurisdictional requirements. Although, as we discuss below, the County cannot show the proximate causation that is necessary for civil RICO standing, the County's allegation that the defendants' hiring and/or harboring of undocumented immigrants within the County caused additional strain on County-provided health and public safety services meets the less rigorous Article III causation threshold, at least at this stage of the proceedings. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (stating that Article III requires the plaintiff to have suffered an injury that is "fairly traceable" to the defendant's conduct); *Barbour v. Haley*, 471 F.3d 1222, 1226 (11th Cir. 2006) ("[F]or purposes of satisfying Article III's causation requirement, we are concerned with something less than the concept of proximate cause.") (citation and internal quotation marks omitted), *cert. denied*, 127 S. Ct. 2996 (2007); *Lerner*, 318 F.3d at 122 & n.8 (holding that plaintiffs' allegations failed to meet RICO proximate causation requirements but satisfied "the lesser burden for constitutional standing"). Thus, because Article III jurisdiction is not at issue, we review the question of whether the County satisfies civil RICO's standing requirements under the standard for Rule 12(b)(6).

[8]Because the County cannot meet the more liberal "any set of facts" standard, we need not decide whether the Supreme Court's recent "retire-

301 F.3d 1163, 1167 (9th Cir. 2002) (citation and internal quotation marks omitted). We may, however, affirm the dismissal on any ground supported by the record. *McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1090 (9th Cir. 2003).

## DISCUSSION

**[1]** A civil RICO "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496; *see* 18 U.S.C. § 1964(c). Below, we examine whether the allegations in the County's complaint meet the requirements for standing under RICO's civil suit provision, 18 U.S.C. § 1964(c). We discuss first whether the County has alleged the requisite type of injury, then whether the defendants' alleged RICO violations could have proximately caused the County's injury.

## I.  Canyon County Has Failed to Allege that It Has Been Injured in Its Business or Property

**[2]** To determine whether a plaintiff has sufficiently alleged that he has been "injured in his business or property," we must examine carefully the nature of the asserted harm. Our circuit requires that a plaintiff asserting injury to property allege "concrete financial loss." *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc). Financial loss alone, however, is insufficient. "Without a harm to a specific business or property interest — a categorical inquiry typically determined by reference to state law — there is no injury to business or property within the meaning of RICO." *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1131 (2006).

---

ment" of the "no set of facts" standard, *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1968-69 (2007), and its adoption of a new "plausibility" standard, *see id.* at 1965-67, applies to RICO complaints.

In this case, the County bases its RICO claims on the fact that "it has paid millions of dollars for health care services and criminal justice services for the illegal immigrants who have been employed [and/or harbored] by the defendants in violation of federal law." The County argues that it has sufficiently alleged that it has been injured in its property because it claims to have been forced to spend money. According to the County, "[a]ny involuntary expenditure of money is a loss of 'property.' " However, a government entity cannot rely on expenditures alone to establish civil RICO standing, and there is no indication that the County holds a property interest in the law enforcement or health care services that it provides to the public.

### A. Government Expenditures Alone Are Insufficient to Qualify as Injury to Property

In the ordinary context of a commercial transaction, a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) (interpreting provision of the Clayton Act that grants standing to "any person . . . injured in his business or property" by an antitrust violation). As the Supreme Court reasoned in *Reiter*, "[i]n its dictionary definitions and in common usage 'property' comprehends anything of material value owned or possessed. Money, of course, is a form of property." *Id.* at 338 (citation omitted). Thus, the Court concluded that "where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated . . . , she has alleged an injury in her 'property' . . . ." *Id.* at 342.

[3] Similarly, government entities that have been overcharged in commercial transactions and thus deprived of their money can claim injury to their property. *See Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906) (holding that city's claim that it was overcharged for its purchases of water pipe qualified as allegation that it was

"injured in its property . . . by being led to pay more than the worth of the pipe"); *County of Oakland v. City of Detroit*, 866 F.2d 839, 847 (6th Cir. 1989) (outlying counties "sustained an injury in their property when they paid the allegedly excessive charges" to Detroit for treatment and disposal of sewage).

**[4]** But the law commonly distinguishes between the status of a governmental entity acting to enforce the laws or promote the general welfare and that of a governmental entity acting as a consumer or other type of market participant. *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601-02 (1982) (distinguishing between the sovereign, quasi-sovereign, and proprietary interests of governmental bodies). When a governmental body acts in its sovereign or quasi-sovereign capacity, seeking to enforce the laws or promote the public well-being, it cannot claim to have been "injured in [its] . . . property" for RICO purposes based solely on the fact that it has spent money in order to act governmentally. All government actions require the expenditure of money in this sense, insofar as the government acts through public servants who are paid for their services. If government expenditures alone sufficed as injury to property, any RICO predicate act that provoked any sort of governmental response would provide the government entity with standing to sue under § 1964(c) — an interpretation of the statute that we think highly improbable. We find it particularly inappropriate to label a governmental entity "injured in its property" when it spends money on the provision of additional public services, given that those services are based on legislative mandates and are intended to further the public interest.

### B. The County Does Not Have a Property Interest in Services It Provides to Enforce the Laws and Promote the Public Welfare

**[5]** As the County cannot satisfy the requirement of injury to a "specific property interest" based solely on its expenditure of money to provide public services, we must examine

whether the County can claim a property interest in the services themselves. We conclude that the government does not possess a property interest in the law enforcement or health care services that it provides to the public; therefore, a governmental entity is not "injured in its property" when greater demand causes it to provide additional public services of this type.

**[6]** We base this conclusion on several factors. First, the ordinary meaning of the term "property" does not include the interests of local governments in performing functions such as policing, caring for the indigent sick, and otherwise protecting the well-being of the public. Moreover, following *Diaz*'s instruction to determine whether the relevant state's law recognizes the alleged property interest, we see no indication that Idaho law creates a property-like entitlement in such services on the part of counties. *See Diaz*, 420 F.3d at 900. The County has made no showing that Idaho law grants counties a protectable legal interest in the public services they provide, and we have found none. The persuasive authority of other jurisdictions tilts against such an interest. *Cf. id.* (plaintiff's claim for lost wages due to false imprisonment alleged harm to a property interest, because California law recognizes the torts of intentional interference with contract and interference with prospective business relations); *see also Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 364 (9th Cir. 2005) (plaintiff's claim alleging diminished litigation settlement due to the defendant's fraud alleged injury to a property interest, because fraudulent inducement is an actionable tort under Hawaii law), *cert. denied*, 126 S. Ct. 2861 (2006).

**[7]** Second, the Supreme Court has interpreted the statutory provision that served as a model for § 1964(c) to exclude claims for damages to governments' non-proprietary interests. The civil enforcement provision of the antitrust laws, § 4 of the Clayton Act, provides a private right of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." 15 U.S.C.

§ 15(a). Because Congress based the RICO private right of action on § 4, courts have often, though not invariably, interpreted the two statutory provisions in a like manner. *See, e.g.*, *Holmes*, 503 U.S. at 267-68; *Sedima*, 473 U.S. at 489, 498-99. Interpreting the Clayton Act, the Court has read the phrase "injured in his business or property" to encompass only injury to a state's "commercial interests," meaning "the interests of the [state] as a party to a commercial transaction." *Reiter*, 442 U.S. at 341-42. If a similar interpretation of the identical phrase is applied in the RICO setting, a government's claim for its law enforcement and health care expenditures would not qualify as injury to property.

In *Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972), the State of Hawaii sued four petroleum suppliers for antitrust violations. Hawaii raised claims in three capacities: a claim in the state's proprietary capacity for overcharges it paid directly as a consumer of petroleum products; a claim in its parens patriae capacity as a representative of the state's citizens; and a class action claim on behalf of all consumers in the state. *Id.* at 253-56. To support the claims brought in the state's parens patriae capacity, Hawaii alleged various harms, including loss of its citizens' revenues, increases in taxes as a result of lost revenues, lost opportunities in commerce, and frustration of state measures to promote its citizens' welfare. *Id.* at 255. The Court held that the state, acting in a parens patriae capacity to redress injury to its general economy, had not been injured in its property and thus lacked standing to recover damages under § 4 of the Clayton Act. The Court stated:

> Like the lower courts that have considered the meaning of the words 'business or property,' we conclude that they refer to commercial interests or enterprises. When the State seeks damages for injuries to its commercial interests, it may sue under § 4. But where, as here, the State seeks damages for other injuries, it is not properly within the Clayton Act.

*Id.* at 264 (citations omitted).

The Court also relied on 15 U.S.C. § 15a, an adjacent provision permitting the federal government to recover damages whenever "injured in its business or property" by an antitrust violation. That provision, the Court wrote, did not permit the United States to "recover for economic injuries to its sovereign interests, as opposed to its proprietary functions." *Id.* at 265. Similarly, the Court held, "[§] 4, which uses identical language, does not authorize recovery for economic injuries to the sovereign interests of a State." *Id.*

Later, in *Reiter*, the Court clarified that states could claim to have been injured in their property when alleging harm to their interests as consumers, despite the reference in *Hawaii* to the state's "commercial interests":

> The phrase 'commercial interests' was used [in *Hawaii*] as a generic reference to the interests of the State of Hawaii as a party to a commercial transaction. This is apparent from *Hawaii*'s explicit reaffirmance of the rule of *Chattanooga Foundry* and statement that, where injury to a state 'occurs in its capacity as a consumer in the marketplace' through a 'payment of money wrongfully induced,' treble damages are recoverable by a state under the Clayton Act.

*Reiter*, 442 U.S. at 341-42.

**[8]** As used in the Clayton Act's private right of action, then, the phrase "business or property" excludes states' interests in their sovereign or quasi-sovereign capacities, but does include states' interests as ordinary marketplace actors. We believe that this interpretation of the phrase "business or property" should apply in the context of a civil RICO claim, as well.

The Second Circuit has already applied *Hawaii* and *Reiter* in this way. In *Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 103-04 (2d Cir. 1990), the court considered a town's civil RICO claims against abortion protesters who had demonstrated for two days at a local clinic. According to the town, the protesters' activities amounted to extortion against the town under the Hobbs Act and thus were a pattern of racketeering activity. *Id.* at 95-98. The town alleged that the protesters had limited the police department's ability to respond to other public safety needs, and caused extraordinary police overtime wage expenses, among other harms, all of which amounted to "injury to the governmental functions and property" of the town. *Id.* at 95-96.

The court first concluded that extortion under the Hobbs Act required the "obtaining of property from another by wrongful means" and that neither "altered official conduct" nor overtime police expense qualified as property for this purpose. *Id.* at 101-02 (internal quotation marks omitted). Therefore, the town had failed properly to allege any RICO predicate acts and there was "no plausible basis for . . . assertion" of the RICO claim. *Id.* at 102-03. The court then analyzed whether the town had alleged injury to its "business or property" resulting from the RICO violation, as required for civil RICO standing. Relying on *Hawaii* and *Reiter* for the proposition that a governmental entity may "recover for such injury only when it functions 'as a party to a commercial transaction,' " the Second Circuit held that "[i]njuries of the sort asserted by the Town do not fall within the ambit of section 1964(c)." *Id.* at 104.

Thus, the Second Circuit held that the town's claimed injuries stemming from the burden the protesters placed on the town's police department — which included expenditures for increased overtime costs — did not qualify as injury to the town's business or property. Rather, these were injuries to the

town's sovereign or quasi-sovereign interests of the sort held non-compensable in *Hawaii*.[9]

**[9]** The injuries claimed by the County in this case, increased expenditures for law enforcement and health care services, are analogous to those that the Second Circuit ruled non-compensable in *Town of West Hartford*. The County sustained these injuries in its sovereign and/or quasi-sovereign capacities, and may not claim the costs as damages to its property for purposes of civil RICO standing.

We note finally that the common law doctrine barring government recovery of the costs of public safety services in tort supports our holding. The rationale underlying the "municipal cost recovery rule" is twofold: (1) that there is little reason for courts to use tort law to unsettle expectations and disrupt the existing, tax-payer funded system of providing public safety

---

[9]Although the Second Circuit's interpretation of "business or property" for RICO standing purposes in *Town of West Hartford* has been characterized as dicta, lower courts have relied on it in several instances. *See Attorney Gen. v. R.J. Reynolds Tobacco Holdings, Inc.*, 103 F. Supp. 2d 134, 151-55 (N.D.N.Y. 2000) (holding that "*Town of West Hartford* compels the Court to conclude that [increased law enforcement] costs do not constitute a cognizable RICO injury to Canada as a party to a commercial transaction"), *aff'd on other grounds*, 268 F.3d 103 (2d Cir. 2001); *City of New York v. JAM Consultants, Inc.*, 889 F. Supp. 103, 105 (S.D.N.Y. 1995) (holding that city's relationship with its employees is a "commercial relationship" under *Town of West Hartford*, and thus inducement of disloyal employee conduct injures city in its property interests for purposes of RICO standing); *Town of Brookline v. Operation Rescue*, 762 F. Supp. 1521, 1523 (D. Mass. 1991) (holding that town could not establish that it had been injured in its business or property based on increased expenses resulting from abortion protests). *But see City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 555-56 (S.D.N.Y. 2005) (characterizing the law as "unsettled" following *Town of West Hartford* and holding that city's loss of its right to collect sales taxes may qualify as injury to its business or property); *Eur. Cmty. v. RJR Nabisco, Inc.*, 150 F. Supp. 2d 456, 492-93 (E.D.N.Y. 2001) (concluding that foreign government's claim for lost tax revenues and increased law enforcement costs "are, at bottom, claims for lost money" and thus qualify as property for RICO standing purposes).

services; and (2) that it is not the courts' role to disturb the legislature's decision to fund such services as a part of its overall fiscal policy choices. *See City of Flagstaff*, 719 F.2d at 323-24. A number of courts have applied this rule to bar recovery by local governments of public safety expenses.[10]

In this instance, we are not dealing with state common law, but with a statutory cause of action created by Congress. Therefore, we are not concerned that our court might upset the local legislative body's fiscal policy by allowing recovery for public safety services. Instead, the question is one of Congress' intent, specifically whether Congress meant to disrupt settled expectations and alter the legislatively-chosen system of funding local government services. We recognize that Congress could have used its powers to do so, enabling local governments to pursue treble damages under RICO for injuries arising from their provision of governmental services. But had Congress intended such a result, we believe that Congress would have been more explicit; the term "business or property" does not readily connote a government's interest in the services it provides in its sovereign or quasi-sovereign capacity.[11] As we think it unlikely that Congress intended this type

---

[10]*See, e.g.*, *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984); *County of San Luis Obispo v. Abalone Alliance*, 223 Cal. Rptr. 846, 850-52 (Ct. App. 1986); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1144-47 (Ill. 2004); *City of Bridgeton v. B.P. Oil, Inc.*, 369 A.2d 49, 54 (N.J. Super. Ct. 1976); *Koch v. Consol. Edison Co.*, 468 N.E.2d 1, 7-8 (N.Y. 1984). *But cf. White v. Smith & Wesson Corp.*, 97 F. Supp. 2d 816, 821-23 (N.D. Ohio 2000); *City of Gary v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1242-44 (Ind. 2003); *James v. Arms Tech., Inc.*, 820 A.2d 27, 48-49 (N.J. Super. Ct. 2003); *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1149-50 (Ohio 2002).

[11]There is no legislative history regarding Congress' intent in this regard. *Cf. Sedima*, 473 U.S. at 495 n.13 (referring to what lower court described as the " 'clanging silence' of the legislative history" of § 1964(c) regarding the provision's scope); *see also Reiter*, 442 U.S. at 343 ("Many courts and commentators have observed that the respective legislative histories of § 4 of the Clayton Act and § 7 of the Sherman Act, its predecessor, shed no light on Congress' original understanding of the terms 'business or property.' ").

of recovery under RICO, and because Idaho's legislature has assigned the fiscal burden for law enforcement and health care services differently, it is not our place to disturb these decisions.

Contrary to the County's argument, in holding that the costs of their law enforcement and public health care services are not recoverable damages under civil RICO, we are not inserting an additional injury requirement into § 1964(c). Rather, our holding is based on the statutory language itself. We simply do not think that the term "business or property" can be interpreted to encompass the sorts of interests that the County relies on in this case.

[10] In light of the foregoing reasoning, we conclude that the County lacks RICO standing and cannot bring suit under RICO for the injuries that it asserts in its complaint.

## II.   Canyon County Cannot Show That the Alleged RICO Violations Proximately Caused Its Injuries

Even if the County's claimed injuries were cognizable under § 1964(c) as injuries to property, the County's complaint is flawed in another critical aspect: most of the defendants' alleged RICO violations do not bear a direct connection to the County's asserted harms. *See Anza*, 126 S. Ct. at 1998 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

### A.   *The County's Claims Against the Defendant Companies*

Canyon County alleges that it "has paid millions of dollars for health care services and criminal justice services for the illegal immigrants who have been employed by the defendants in violation of federal law." We conclude that the

County cannot, as a matter of law, show an adequate causal nexus between the four defendant companies' employment of undocumented workers and the financial harm the County claims to have suffered.

[11] A "showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's injury" is insufficient to meet the requirement in § 1964(c) that the plaintiff's injury be "by reason of" the RICO violation. *Holmes*, 503 U.S. at 265-66. Rather, a plaintiff must also show that the defendant's RICO violation proximately caused her injury. *Id.* at 268. Proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.*

In *Holmes*, the Court applied the proximate cause requirement to preclude a RICO suit by a plaintiff whose injury was entirely contingent on the injury of direct victims. *Id.* at 271-74. In that case, a number of conspirators had allegedly engaged in a fraudulent stock manipulation scheme which led to the insolvency of two securities broker-dealers. As a result of the insolvency, the broker-dealers could no longer meet their obligations to their customers, and the plaintiff, the Securities Investor Protection Corporation ("SIPC"), was forced to cover the broker-dealers' debts. *Id.* at 262-63. SIPC asserted the broker-dealers' customers' claims against the conspirators, arguing that the customers had been injured "by reason of" the conspirators' fraudulent scheme in violation of RICO. The Court disagreed, noting that "the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims." *Id.* at 271. Finding "the link . . . too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers," the Court concluded that proximate causation was lacking. *Id.*

[12] Subsequently, in *Anza*, the Supreme Court clarified that the *Holmes* proximate cause requirement not only bars

RICO suits by derivative victims, or those whose injuries are "purely contingent on the harm suffered by" direct victims, but generally precludes recovery by those whose injuries are only tenuously related to the RICO violation at issue. 126 S. Ct. at 1996. Under *Anza*, courts must scrutinize the causal link between the RICO violation and the injury, identifying with precision both the nature of the violation and the cause of the injury to the plaintiff. *See id.* at 1996-98. Where the violation is not itself the immediate cause of the plaintiff's injury, proximate cause may be lacking.

In *Anza*, Ideal Steel Supply Company sued its competitor, alleging that the competitor had violated RICO by conducting its business through a pattern of defrauding the State of New York of sales tax payments. *Id.* at 1994. According to Ideal, the defendant was able to undersell Ideal by not charging sales tax on cash purchases, and thus deprived Ideal of sales it otherwise would have made. *Id.* at 1994-95, 1997. The Court concluded, however, that the competitor's alleged violations could not have proximately caused Ideal's injuries, because "[t]he cause of Ideal's asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 1997.

In support of this conclusion, the Court discussed the rationale for the requirement that the plaintiff's harm directly result from the alleged RICO violation. *Id.* (citing *Holmes*, 503 U.S. at 269-270). First, the Court cited "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action." *Id.* The Court emphasized the attenuated causal chain between the defendant's tax fraud and the plaintiff's loss of sales. It noted the difficulty of determining whether the defendant's lower prices were in fact based on the defendant's fraudulent failure to pay sales tax, or whether other causes determined the defendant's pricing. *Id.* The Court also pointed out that the plaintiff's lost sales could have resulted from a host of factors other than its competitor's fraud. *Id.*

Second, the Court discussed "the speculative nature of the proceedings that would follow if Ideal were permitted to maintain its claim." *Id.* at 1998. A court would have to determine the portion of Ideal's damages resulting from the RICO violation, by evaluating the relative causal role of the defendant's fraud in lowering the defendant's prices, and the relative causal role of those lowered prices in diminishing Ideal's sales — in effect, requiring a complex apportionment of fault among various causes. *Id.* The proximate causation requirement "is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." *Id.*

Finally, the Court referenced the consideration of whether "the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Id.* In the case before the Court, the State of New York could be expected to pursue its own remedies for the fraud practiced upon it by the defendant. Thus, the Court found "no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly." *Id.*

**[13]** Under *Anza*, we must determine whether the County meets the proximate cause requirement by examining "whether the alleged violation led directly to the plaintiff's injuries." *Id.*[12] The basis of the RICO violation, according to the County's complaint, is the defendant companies' knowing hiring of undocumented immigrants. The alleged harm is the

---

[12]We are mindful that, in evaluating a complaint's adequacy at the motion to dismiss stage, we must "presume that general allegations embrace those specific facts . . . necessary to support the claim." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004) (quoting *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994), in support of the proposition that "a weak or insubstantial causal link" is not a good basis for dismissal on the pleadings). *Anza* itself, however, dealt with the adequacy of the proximate cause allegations at the motion to dismiss stage. 126 S. Ct. at 1994. It is therefore evident that courts need not allow RICO plaintiffs leeway to continue on with their case in an attempt to prove an entirely remote causal link.

County's increased expenditures on health care and criminal justice services. Here, just as in *Anza*, the cause of the plaintiff's asserted harms is a set of actions (increased demand by people within Canyon County for public health care and law enforcement services) entirely distinct from the alleged RICO violation (the defendants' knowing hiring of undocumented workers).

[14] The three rationales for the proximate cause requirement described in *Anza* also suggest that the County's harm fails the proximate cause test. *Cf. id.* at 1997. As to the first consideration, the difficulty of assessing causation, the asserted causal chain in this instance is quite attenuated, and there are numerous other factors that could lead to higher expenditures by the County. In fact, it is not clear how the companies' hiring of undocumented immigrants would increase demand for health care and law enforcement within Canyon County. Further, holding employers liable for the actions of their employees that are not even recognized as being a basis for respondent superior liability would be contrary to centuries of precedent concerning proximate causation.

[15] The causal chain would also be difficult to ascertain because there are numerous alternative causes that might be the actual source or sources of the County's alleged harm. Increased demand for public health care and law enforcement may result from such varied factors as: demographic changes; alterations in criminal laws or policy; changes in public health practices; shifts in economic variables such as wages, insurance coverage, and unemployment; and improved community education and outreach by government.

[16] Second, the proceedings required to evaluate the County's injury would be speculative in the extreme, perhaps more so than those discussed in *Anza*. *Cf. id.* at 1998. A court would be forced to evaluate the extent to which the companies' illegal hiring practices had created increased demand for

County services. This would not consist of simply estimating the number of undocumented immigrants employed by the companies and their average usage of County services. Rather, the court would have to construct the alternative scenario of what would have occurred had the companies employed legally authorized workers, and determine how this might have affected the County's total population, and how these alternative workers might have differed from the undocumented workers in their consumption of County services, if at all. This would be an "intricate, uncertain" inquiry of the type that the *Anza* Court warned against. *Id.*

Given the substantial — and fatal — shortcomings of the complaint in meeting *Anza*'s proximate cause requirements, we need not inquire into the question of whether there are more immediate victims of the defendants' alleged RICO violations who are likely to sue. *See Newcal Indus., Inc. v. IKON Office Solution*, 2008 WL 185520, at *13 (9th Cir. 2008).[13]

The County has attempted to limit *Anza*'s reach, characterizing the holding as applying only to "derivatively injured plaintiffs." Because the County's injury is not "derivative of an injury suffered by any other party," the County asserts that *Anza* is inapplicable.

We are, however, unpersuaded by the County's attempt to distinguish *Anza* as a "derivative or passed-on" injury case. It is true that the Court in *Holmes* dealt with derivative injury, in the sense that any harm to the plaintiff occurred only to the extent that a direct victim's injuries were "passed on," or flowed through another victim. But there was no such

---

[13]We note that under *Anza*, the likelihood of more direct victims bringing suit is not essential to a finding of no proximate cause. *See Anza*, 126 S. Ct. at 1998 (noting that "[t]he requirement of a direct causal connection is *especially warranted* where the immediate victim of an alleged RICO violation can be expected to vindicate the laws by pressing their own claims") (emphasis added).

"passed-on" harm in *Anza*: the plaintiff alleged that it lost business due to the defendant's lowered prices, a harm which was distinct from and not contingent on the harm suffered by the state due to the defendant's sales tax fraud. Thus, *Anza* applies fully to cases like this one, where the harm to the plaintiff from the defendant's RICO violation does not flow through any intervening victims.

**[17]** The County's claims against the defendant companies fail for lack of proximate causation. The asserted link between the companies' hiring practices and increased demand for County services is far too attenuated.

### B.    The County's Claim Against Pacheco

The County's claim against Albert Pacheco, the former Executive Director of the Idaho Migrant Council, is founded on two specific factual allegations: first, that Pacheco directed his staff to assist undocumented immigrants in filing false applications for the County's indigent medical assistance fund, which cost the County money; and second, that Pacheco directed his staff to assist undocumented immigrants in procuring public housing, and that those immigrants subsequently burdened the County's public assistance and criminal justice systems. As we noted above, neither of these allegations supports a claim that the County was injured in its "property," and so the claim against Pacheco was properly dismissed for that reason. The second allegation against Pacheco, that he assisted immigrants in securing housing, suffers from an additional flaw: lack of proximate causation.

Here, as in *Anza*, the defendant's alleged RICO violation (assisting undocumented immigrants in securing housing) is distinct from the cause of the plaintiff's harm (increased demand placing a burden on Canyon County's public assistance and criminal justice systems). Further, the considerations cited in Anza demonstrate that proximate cause is absent. *See id.* at 1997-98. The causal chain between the

RICO violation and the plaintiff's harm is dubious for any number of reasons: for example, the immigrants might have secured public housing without Pacheco's staff's assistance, and the immigrants might have remained in the County even without being able to occupy public housing. It is even more attenuated to postulate that having the benefit of public housing made the immigrants more prone to commit crimes, require health care, or otherwise increase their use of County services. Given the speculative nature of the causal links between the alleged harm and Pacheco's actions, a court attempting to identify the specific portion of the County's financial loss caused by Pacheco's actions would be sorely pressed to do so. Finally, to the extent that Pacheco's actions were indeed unlawful, the most direct victim is the public housing authority itself; there is little need to allow the County to pursue this RICO claim in order to vindicate the laws.

**[18]** Thus, we conclude that proximate causation is lacking as to this portion of the County's claim against Pacheco.

## CONCLUSION

We conclude that the County lacks statutory standing under 18 U.S.C. § 1964(c) to proceed with its federal RICO claims against the four defendant companies. First, the County has failed to plead that it has been "injured in [its] business or property" by reason of the defendants' alleged RICO violations. Second, the County cannot show that its claimed injuries were proximately caused "by reason of" the defendant companies' alleged RICO violations.

As for the County's claim against the individual defendant, Pacheco, the County lacks standing to pursue this claim as well: the County has not pled injury to its business or property, and proximate causation is lacking as to at least a portion of Pacheco's alleged RICO violations.

As a consequence, the judgment of the district court dismissing the County's federal RICO claims is **AFFIRMED.**